UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                          )
ESTATE OF NICHOLAS SACCO                  )
          Plaintiff                       )
                                          )
              vs.                         )        Case No.: 20-cv-447-JL
                                          )
HILLSBOROUGH COUNTY HOUSE OF              )
CORRECTIONS, *et al*.                     )
                                          )
          Defendants                      )
_____)


### PLAINTIFF'S PARTIAL OBJECTION TO HILLSBOROUGH COUNTY DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

NOW COMES the Plaintiff, the Estate of Nicholas Sacco, by and through its attorneys, Shaheen & Gordon, P. A., and respectfully submits this Partial Objection to Hillsborough County Defendants' Motion to Dismiss Amended Complaint, and in support therefore, states as follows:

### I.     PREFACE

Defendants' Motion to Dismiss is a partial dispositive motion that seeks to dismiss two of Plaintiff's four claims against the Hillsborough County Defendants: 1) Plaintiff's § 1983 claims against the eight nurse defendants; and 2) Plaintiff's state law medical malpractice claims against the same eight nurse defendants.[1]  Defendants did not move to

---

[1] As explained further below, Plaintiffs did not assert any state law claim against Hillsborough County. Plaintiff's state law medical malpractice claims are aimed squarely at the eight nurses in their individual capacities, which the Hillsborough County defendants appear to have misconstrued on pages 19 to 24 of their memorandum.

dismiss: 1) Plaintiff's ADA claim against Hillsborough County Department of Corrections ("HCDOC"); or 2) Plaintiff's *Monell* claim against HCDOC.

Plaintiff does not oppose Defendants' instant Motion to Dismiss as it relates to his § 1983 and state law medical malpractice claims against: 1) BRYANNA GUE, RN; and 2) NICOLE MASCI, LPN, both of whom he agrees to dismiss.  As to the remaining six nurse defendants, Plaintiff respectfully submits that his First Amended Complaint sets forth sufficient allegations to plausibly support his § 1983 civil rights claims, and further that his state law medical malpractice claims are not precluded as a matter of law.

## II.     THE APPLICABLE LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"A state and its subdivisions are under a substantive obligation imposed by the Due Process Clause of the Fourteenth Amendment to refrain . . . from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health." *Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 39 (1st Cir. 2011).

Traditionally, the standard for a claim of deliberate indifference based on inadequate or delayed medical care to any inmate had been that: "a plaintiff must satisfy both a subjective and objective inquiry." *Leavitt v. Corr. Med. Servs.,* 645 F.3d 484, 497 (1st Cir.2011).  Plaintiffs had to show first, "that prison officials possessed a sufficiently

culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety," and second, that the deprivation alleged was "objectively, sufficiently serious." *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002). And, until recent, this same standard has been applied equally to due process claims brought by convicted inmates under the Eight Amendment, and due process claims brought by pretrial detainees under the Fourteenth Amendment. *Id* at 7.

Defendants' Motion largely assumes, without meaningful discussion, that this Court will apply the traditional, two-part subjective and objective test. However, Plaintiff respectfully submits that, whereas Plaintiff was a pretrial detainee who brings his claims under the Fourteenth Amendment, this Court should apply the objective unreasonableness standard that was recently established in *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015).

There should be no dispute that the rights of pretrial detainees are different than the rights of post-conviction detainees. As the First Circuit has held: "The Fourteenth Amendment provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007). Because pre-trial detainees are presumed innocent, they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)). For years, scholars and advocates have

called for a shift away from using the subjective deliberate indifference standard for

pretrial detainees' Fourteenth Amendment claims and have suggested that courts instead

apply an objective deliberate indifference standard to these claims.  *See* Catherine T.

Struve, The Conditions of Pretrial Detention, 161 U. Pa. L. Rev. 1009, 1068 & n.345

(2013).

Five years ago, in *Kingsley*, the Supreme Court of the United States did exactly

that in holding that a pretrial detainee may prevail on a § 1983 excessive force claim if he

or she shows that the force used was objectively unreasonable, regardless of whether the

officer had a subjective intent to cause the detainee harm.  576 U.S. 389, 135 S. Ct. 2466

(2015).

### A.  *Kingsley v. Hendrickson*

Kingsley, a pretrial detainee, alleged that two correctional officers slammed his

head into a concrete bunk and then tasered him.  *Id* at 2470.  Kingsley brought a § 1983

claim for excessive force under the Fourteenth Amendment.  *Id*.  The jury found in the

officers' favor based on jury instructions that required a showing of subjective deliberate

indifference.  *Id*.  On appeal, Kingsley argued that the correct standard to be applied for

judging a pretrial detainees' excessive force claim is objective unreasonableness.  *Id*.  The

majority of the Seventh Circuit panel disagreed and held that the law required a showing

of subjective deliberate indifference, with one judge dissenting.  *Id*.  The Supreme Court

granted certiorari.  *Id.*

The Supreme Court reversed the Seventh Circuit and remanded the case, holding

that a pretrial detainee may prevail on a § 1983 claim for excessive force if he shows that

the force used was objectively unreasonable, regardless of whether the officer had a

subjective intent to cause harm.  *Id* at 2472.  The Court noted that "**a pretrial detainee**

**can prevail by providing only objective evidence that the challenged government action is not rationally related to a legitimate governmental objective or that is excessive in relation to that purpose.**" *Id* at 2473.  Significantly, the Supreme Court did not limit these comments to excessive force claims.

### B.  The *Kingsley* Standard Applies to Pretrial Detainee Sacco's Claim for Denial of Medical Care Under the Fourteenth Amendment

"While *Kingsley* did not necessarily answer the broader question of whether the objective standard applies to all Section § 1983 claims brought under the Fourteenth Amendment against individual defendants, logic dictates extending the objective deliberative indifference standard articulated in *Castro* to medical care claims." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019).  And that is exactly what federal courts across the country have actively been doing over the past five years.

In *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017), the Second Circuit adopted the following standard:

> Therefore, to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively."

The Ninth Circuit recently adopted a very similar standard in *Gordon*:

> Accordingly, we hold that claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective

> deliberate indifference standard. Based thereon, the
> elements of a pretrial detainee's medical care claim against
> an individual defendant under the due process clause of the
> Fourteenth Amendment are: (i) the defendant made an
> intentional decision with respect to the conditions under
> which the plaintiff was confined; (ii) those conditions put
> the plaintiff at substantial risk of suffering serious harm;
> (iii) the defendant did not take reasonable available
> measures to abate that risk, even though a reasonable
> official in the circumstances would have appreciated the
> high degree of risk involved—making the consequences of
> the defendant's conduct obvious; and (iv) by not taking such
> measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), cert. denied sub
nom. *Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019)(citations
omitted).

*Gordon* expounded further on the objective unreasonableness element:

> "With respect to the third element, the defendant's conduct
> must be objectively unreasonable, a test that will necessarily
> 'turn on the facts and circumstances of each particular case.'
> The " 'mere lack of due care by a state official' does not
> deprive an individual of life, liberty, or property under the
> Fourteenth Amendment." Thus, the plaintiff must "prove
> more than negligence but less than subjective intent—
> something akin to reckless disregard."

*Id.*

In *Miranda v. Cty. of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018), the Seventh

Circuit also applied *Kingsley* to a pretrial detainee's claim for denial of medical care and

held: "As applicable here, the first of those inquiries asks whether the medical defendants

acted purposefully, knowingly, or perhaps even recklessly when they considered the

consequences of their handling of [Plaintiff's] case."

**C.  This Court is Well Within Its Discretion to Apply *Kingsley* Here**

The entirety of Defendants' discussion of *Kingsley* can be found within one

footnote that is four sentences long.  There, Defendants point to the *Zingg v. Groblewski*

order to argue that "the First Circuit has expressly continued to recognize both the

objective and subjective prongs in deliberately indifferent medical care claims asserted by pretrial detainees."  907 F.3d 603, 635 (1st Cir. 2017).  A closer examination reveals that *Zingg*, the one case Defendants point to, does not exactly stand for the broad proposition that Defendants argue.  Notably, the Plaintiff in *Zingg* asserted § 1983 claims for violation of her right under the Eighth Amendment to be free from cruel and unusual punishment. *Id* at 633.  Here, Sacco did not bring any claim under the 8th amendment.  Rather, Sacco properly asserted his claims under the Fourteenth Amendment.  *See* Amended Complaint ("AC") at ¶ 1.  In addition, the *Zingg* order makes absolutely no mention of *Kingsley*.

Defendants are plainly wrong to argue that this Court is bound by precedent to apply the outdated deliberate indifference standard.  Less than a year ago, in the *Gomes* decision, Judge McCafferty conducted a detailed analysis of the broader applicability of *Kingsley* to other types of claims brought by pretrial detainees: "The Supreme Court has not issued any decision since *Kingsley* directly addressing whether the purposeful or knowing, objective unreasonableness standard applied in *Kingsley* also applies to claims brought by pretrial detainees about government acts or omissions that deny them medical care or expose them to substantial health and safety risks."  *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, No. 20-CV-453-LM, 2020 WL 2514541, at *11 (D.N.H. May 14, 2020).

After thoroughly discussing post-*Kingsley* caselaw, the court summarized that: "In the absence of binding, post-*Kingsley* authority, district courts within the First Circuit do not agree whether the subjective prong of a deliberate indifference claim still applies to due process claims brought by civil detainees."  *Id.*  The court went on to note that most recently, in a case in which three ICE detainees at Wyatt Detention Center brought habeas corpus petitions alleging that their conditions of confinement violated their due process

rights, Judge Smith accepted both parties' agreement that "objective unreasonableness" was the appropriate post-*Kingsley* standard and analyzed the case through an "objective unreasonableness prism." *Medeiros v. Martin*, No. CV 20-178 WES, 2020 WL 2104897, at *4, n.1 (D.R.I. May 1, 2020). Ultimately, in *Gomes,* the court held that: "**Based on the pertinent reasoning of *Kingsley* and the persuasive authority of other courts, it is likely that civil detainees no longer need to show subjective deliberate indifference in order to state a due process claim for inadequate conditions of confinement**." *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, No. 20-CV-453-LM, 2020 WL 2514541, at *12 (D.N.H. May 14, 2020). Here, Plaintiff respectfully submits that the same holding should apply to the § 1983 claims of pretrial detainee Sacco, and that Plaintiff should be held to the objective unreasonableness standard instead of the subjective deliberate indifference standard.

While the *Gomes* decision was decided in the context of civil ICE detainees and their conditions of confinement, other courts, including the Fifth Circuit, have held that civil detainees and pretrial detainees are entitled to the same level of protection. *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000). Also, The Third Circuit held in an unpublished decision that immigration detainees are to receive the same due process protections as pre-trial criminal detainees. *Dahlan v. Dep't. of Homeland Sec.*, 215 Fed.Appx. 97, 100 (3d Cir. 2007).

## D. Wanton Disregard Is Sufficient Even if this Court Applies the First Circuit's Traditional, pre-*Kingsley* Standard

If this Court is inclined to apply the First Circuit's traditional, pre-*Kingsley* standard, Plaintiff respectfully submits that *Battista v. Clarke* perfectly lays out what that standard should be. 645 F.3d 449, 452–56 (1st Cir. 2011). Relevant portions include:

The Eighth Amendment standard is in part one of subjective intent. *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970. The phrasing itself implies at least a callous attitude, but **subjective intent is often inferred from behavior and even in the Eighth Amendment context**—contrary to the defendants' assertion—**a deliberate intent to harm is not required**. *Id.* at 835, 114 S.Ct. 1970. Rather, **it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care**. *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991)."

*Id* at 453.

**Because Battista is civilly committed, a different, more plaintiff-friendly standard arguably applies here**: **whether the defendant failed to exercise a reasonable professional judgment**. Youngberg v. Romeo, 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Battista has repeatedly invoked a due process standard and claimed it to be more favorable but does not pinpoint the Youngberg formulation. However, fine-tuning is unnecessary. The two standards are not all that far apart and, to the extent that the Youngberg phrasing governs and is more helpful to Battista, that only reinforces the outcome reached by the district judge.

*Id.*

However, even without an evil motive, the district court could reasonably find that there had been 'denial,' 'delay' and 'interference' under Eighth Amendment precedent and that a reasonable professional judgment had not been exercised under Youngberg.

*Id* at 454.

Yet this would be a much harder case if defendants had proffered a persuasive and untainted professional judgment that—while hormone therapy would help Battista—the dangers, security costs and other impediments made it infeasible. For the problem is not one of callous guards or inept medical care but of conflicting considerations.

*Id* at 454–55.

Like in *Battista*, the circumstances here reveal a complete and callous denial of

medical care without any consideration or professional judgment entailed.  Also like in

*Battisa*, Plaintiff respectfully submits that he can meet his burden regardless of what

standard applies, perhaps rendering any finetuning moot.  The First Circuit has continued

to expressly recognize that "a showing of 'wanton disregard' would be grounds for

deliberate indifference."  *Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015).

Lastly, it is important to note that Plaintiff's First Amended Complaint alleges a

complete denial of medical care from the six nurse defendants at issue, as opposed to a

second guessing of any medical judgments.  As the First Circuit has held: "Where the

dispute concerns not the absence of help, but the choice of a certain course of treatment,

or evidences mere disagreement with considered medical judgment, we will

not second guess the doctors." *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).  However,

as the Sixth Circuit has held:  "treatment may be constitutionally impermissible when it is

'so woefully inadequate as to amount to no treatment at all.'"  *Richmond v. Huq*, 885 F.3d

928, 940 (6th Cir. 2018).  "We agree with the Ninth Circuit that a prisoner who is

needlessly allowed to suffer pain when relief is readily available does have a cause of

action against those whose deliberate indifference is the cause of his suffering."  *Westlake

v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976).

Here, Plaintiff was needlessly allowed to perish in pain when relief was readily

available from the six nurse defendants at issue.  Similarly, as detailed below Plaintiff's

complaint alleges a complete denial of medical care from the nurse defendants that shocks

the conscience.  Plaintiff respectfully submits that as to each of the six nurse defendants

he can show a wanton disregard sufficiently evidenced by complete denial of healthcare.

### III.    SACCO'S FIRST AMENDED COMPLAINT SETS FORTH SUFFICIENT ALLEGATIONS TO PLAUSIBLY SUPPORT HIS § 1983 CLAIMS AGAINST THE SIX NURSE DEFENDANTS

On Thursday, May 16, 2019 at 2:38 p.m., Plaintiff NICHOLAS SACCO was

incarcerated at HCDOC, which is a 700-bed facility.  *See* AC at ¶ 21.  Plaintiff

NICHOLAS SACCO's 72-hour hold was set to expire on Tuesday, May 21, 2019 at 11:15 a.m.  *Id* at ¶ 24.  Tragically, it was just two hours before this 72-hour hold was set to expire that Plaintiff NICHOLAS SACCO was rushed to Elliot Hospital by way of ambulance at 8:40 a.m.  *Id* at ¶ 25.  On Wednesday, May 22, 2019, at 6:51 p.m., Plaintiff NICHOLAS SACCO was pronounced dead.  *Id* at ¶ 26.  The autopsy report identified Plaintiff NICHOLAS SACCO'S cause of death as "complications from opioid withdrawal."  *Id* at ¶ 27.  This has since been confirmed by the expert report of Plaintiff's expert, former Chief Medical Examiner Dr. Thomas Andrew, which has been served on all parties: "In summary, the death of Nicholas Sacco was due solely to withdrawal from opioids under conditions of enforced abstinence in a setting of incarceration.  DOC records clearly indicate Mr. Sacco's chronic use of opioids was well-known by their system.  This death was entirely preventable in that opiate withdrawals can be, but is rarely fatal, and with proper use of validated method to monitor signs and symptoms of withdrawal, treatment can be easily administered."

The timeline clearly shows that the six nurse defendants at issue, with deliberate indifference, denied Plaintiff NICHOLAS SACCO access to medical care to treat his serious medical needs.  *Id* at ¶ 28.  Plaintiffs incorporate by reference the table summarizing SACCO'S care beginning under ¶ 29.  There should be no question that Plaintiff NICHOLAS SACCO had a "serious medical need."  *Id* at ¶ 39.  SACCO clearly died of opiate withdrawal, and it was far from spontaneous in that he showed clear and consistent consistent signs of severe/late withdrawal at HCDOC in the several days prior to his passing.  *Id* at ¶ 29, 43, 44, 73.  There should also be no dispute that SACCO was completely denied medical care and that he was no offered no treatment whatsoever.  *Id*.  Thus, the only question left to be addressed in the instant motion is:  when did SACCO'S

serious medical condition become known and which nurse defendants completely ignored the same?

Plaintiff respectfully submits the nurse defendants had actual knowledge of SACCO'S serious medical need no later than 9:10 p.m. on May 18, 2019, when SACCO reported that he was detoxing from 5 grams of heroin daily and NICOLE MASCI, LPN, put him on detox watch, charting it so that all future nurses who encountered SACCO were aware of the same. *Id* at ¶ 29. At that time, he was already showing signs of late/severe withdrawal, which was documented (restlessness and pulse over 100). *Id* at ¶ 29, 43, 51, 63, and 70.

### i.   GUSTAFSON Denied SACCO'S Pleas to Be Brought to the Hospital on Two Separate Occasions

Defendants' deliberate indifference begins just one hour later, at 10:30 p.m. on May 18, 2019 when SACCO reported to ERICA GUSTAFSON, LPN that "…I'm dizzy and I want to go to the hospital. I'm detoxing." *Id* at ¶ 29 and 32. In addition, his pulse was up to 124, which is well beyond normal limits and considered tachycardia. *Id* at ¶ 29 and 70. GUSTAFSON knew that SACCO required special medical attention, yet despite this knowledge she made no effort to ensure that he would receive necessary care and denied his request. *Id* at ¶ 42.

One hour later, at 11:45 p.m. on May 18, 2019, GUSTAFSON recorded his pulse between 114 and 128, again very high and in the range of tachycardia. And, again, Gustafson did nothing in response other than to document it in his chart. *Id.* Shortly thereafter, at 1:00 a.m. on May 19, 2019, SACCO again asked to see a nurse again and GUSTAFSON took a urine sample. *Id.* It came back positive for fentanyl and negative for all other substances. *Id.*

At 3:00 a.m. on the morning of May 19, 2019, SACCO again requested a nurse. SACCO complained of restlessness and leg cramps, which are additional clear signs that he was progressing even further into late/severe withdrawal. *Id* at ¶ 29, 43, 51, 63, and 70. Significantly, SACCO made a second plea to GUSTAFSON to be brought to the hospital, or at least be given medication. Outrageously, GUSTAFSON'S sole response was to tell SACCO that no meds are given on third shift. *Id.* Not only is this a blatantly false statement (medication is given on the third shift), but it is also a clear display of deliberate indifference under any standard. *Id* at ¶ 42-44, 653. Discovery conducted since the filing of Plaintiff's First Amended Complaint has revealed that GUSTAFSON was a correctional officer for several years at HCDOC, and that she only began working in her capacity as an LPN less than one year before SACCO'S May 2019 incarceration. GUSTAFSON'S deliberately indifferent response to a patient requesting help extends beyond wanton conduct and could be grounds for discipline by the board of health. *Id* at ¶ 63. SACCO ceased any further requests to be brought to the hospital because he knew that there was no use and that he would continue to be ignored as just another opiate junkie. *Id* at ¶ 113-133.

### ii. Allegations Regarding GUSTAFSON's Wanton Conduct That Are Common to All Six Nurse Defendants

On May 18 and May 19, 2019, GUSTAFSON ignored SACCO'S worsening symptoms by failing to: a) contact the provider in house or on call; b) take him to the Urgent Care/call the Urgent Care Center, c) take him to the ED, or d) dial 911. *Id* at ¶ 64. Gustafson knew that, as an LPN, she was not educated to assess patients nor to make an independent determination as to how to respond to his request to be brought to the hospital. *Id* at ¶ 75. These allegations are particularly important for the 5 nurse

defendants at issue here who are LPN'S (GUSTAFSON, HRUBIEC, MORRISON, MALO, AND COULOMBE).  It is impossible for the five LPN nurse defendants to argue that they made a reasonable professional judgment under the circumstances, including denying SACCO's multiple pleas to be brought to the hospital, when they were fundamentally unqualified to make any such independent determinations as LPN's. GUSTAFSON and the other LPN nurse defendants knew that they should have contacted a provider, yet with deliberate indifference they took it upon themselves to ignore SACCO's serious medical needs without any further analysis or consultation, completely depriving him of access to medical care.

A reoccurring theme with GUSTAFSON and the other nurse defendants at issue is their complete denial of medical care to SACCO in the face of clear knowledge of his serious medical needs, including their complete failure to ever contact the AIMG providers.  GUSTAFSON and the other nurse defendants failed to consider or assess Plaintiff NICHOLAS SACCO'S obvious symptoms; instead, they described his travail in great detail in the nursing notes and took no action to assist him.  *Id* at ¶ 63. The HCDOC Healthcare Policies and Procedures policy entitled "Inmate Medication" states: "Nursing personnel are accountable for the administering of inmate medication according to the orders of the facility physician during their respective shift."  *Id*.  GUSTAFSON and other nurse defendants failed to follow basic written procedure in several ways, further indicating the objective unreasonableness and wantonness of their acts and omissions.  *Id* at ¶ 56.  The HCDOC Health Services Department "Detox Procedure" dated February 21, 2019, just three months before Plaintiff NICHOLAS SACCO arrived there, states: "Inmates detoxing from opiates and alcohol may need pharmacological management based upon their symptoms and vital signs.  The assessment of these individuals is

important; thus they need to be monitored closely and frequently.  The Doctor will determine, based upon the nurses' assessment, whether an individual requires medical intervention and initiation of the Detox Protocol."  *Id* at ¶ 56.  Yet, none of the nurse defendants ever performed such an assessment or contacted the providers, and the rate at which they monitored him was shockingly infrequent  *Id* at ¶ 56, 98-101.

Also, the HCDOC Healthcare Policies and Procedures policy entitled "Medical Procedures" states: "It is the policy of the HCDOC to care for inmates who may be in need of emergency or non-emergency medical and dental care…the nurse will notify the appropriate physician/dentist/psychologist of the emergency and the condition of the inmate."  *Id* at ¶ 73.  The record is clear that none of the six nurse defendants at issue ever contacted a provider for any reason, including to assess Plaintiff NICHOLAS SACCO for withdrawal symptoms, even though there were two providers on call 24/7.  *Id* at ¶ 52, 55, 74.  Nurses alone, mostly LPNs, took it upon themselves to assess his status without any consultation with the providers or even RN's, even though they were unqualified to do so.  *Id.*  The nurses made no attempt to arrive at a reasonable professional judgment based on their assessments.  And, even if the five LPN nurse defendants had attempted to arrive at such a reasonable professional judgment, their conduct still would have amounted to objective unreasonableness and/or deliberate indifference because they had no business making any such judgments independently.

The HCDOC's "Standing Orders for Opiate Withdrawal Protocol" state, in part, that: "if indicated by signs and symptoms, initiate standing orders as outlined below for Opiate Withdrawal Protocol".  *Id* at ¶ 76.  The protocol goes on to describe a tapering dose of Vistaril.  *Id.*  No nurses considered the tapering dose of Vistaril, even when Plaintiff NICHOLAS SACCO's symptoms in fact, were late/severe, and did indicate a

need for commencement of medication therapy. *Id* at ¶ 73. Nor did any of the nurse defendants contact a provider about the same.

Had the nurses started Vistaril, standard of care would have dictated they advise the MD/PA that Vistaril had been started. *Id* at ¶ 77. During that conversation, they would have been required to report the signs and symptoms which they believed warranted the commencement of Vistaril. *Id.* At that time, they would have had to describe Plaintiff NICHOLAS SACCO's tachycardia and restlessness, signs of late/severe withdrawal. *Id.* That report to the MD/PA would have caused the MD/PA to examine Plaintiff NICHOLAS SACCO or to request the nurse have him examined in the ED. *Id.*

### iii. MORRISON Outrageously Ignored the Fact that SACCO Was Going into a Life-Threatening Drug Withdrawal and Completely Denied Him Any Access to Medical Care

It is difficult to imagine the level of pain and frustration that Sacco must have been feeling as he entered the day of May 19, 2019, with his pleas for medical assistance having been completely ignored by GUSTAFSON while he was fully aware that he was in the late stages of withdrawal and dying. A 3-minute phone call that he placed to his girlfriend Katy that day at 1:04 p.m. turned out to be his last call made: "He tells her he is really sick, no energy he can barely eat any food and that he passed out last night in his cell three times. States he got up to brush his teeth and that he lost his vision and he passed out. She said he needs to drink more water and he states he is and that he has a cup in his cell. He tells her he doesn't feel well and he needs to go lay down and will call her later. She tells him the worst is over and that he will start to feel better the weather is getting better." *Id* at ¶ 51. Most unfortunately, the worst was not over and SACCO's demise continued into May 19, May 20, and May 21, until a provider from AIMG eventually arrived for his once-a-week scheduled shift to find Sacco in the following

condition: "pt in bed, jaundiced, older than chronological age, no pulse, no respirations. Transferred to floor, started CPR, nasal Narcan x 1, AED place, shock advised. Maintained CPR until 911 crew arrived." *Id* at ¶ 29.

LAURA MORRISON, LPN arrived on the morning of May 19, 2019, to replace GUSTAFSON. At 8:15 a.m., MORRISON recorded SACCO'S blood pressure as 112/70 and his pulse at 120-22, again well in the range tachycardia with Sacco clearly decompensating further into the later stages of withdrawal. *Id* at ¶ 29, 70, 71.

Again, all of the allegations above on pages 11-16 regarding GUSTAFSON'S complete denial of medical care, her complete failure to contact providers, her inability as an LPN to make an independent medical judgment without consultation with the providers, and her multiple breaches of HCDOC protocol, apply equally to MORRISON and each of the remaining nurse defendants. *Id* at ¶ 98-101. The six nurse defendants at issue all failed to adequately monitor the plaintiff, failed to adequately treat the plaintiff, failed to assess the plaintiff, and failed to promptly obtain proper emergency medical care for the plaintiff and otherwise exhibited a deliberate indifference to plaintiff, NICHOLAS SACCO'S, serious medical condition. *Id.* In short, the individual defendants outrageously ignored the fact that NICHOLAS SACCO was going into a life-threatening drug withdrawal. *Id.* With deliberate indifference, MORRISON did not take SACCO'S vitals again that shift and her only other note was at 1:10 p.m., which was just two minutes after he got off the phone with his girlfriend. *Id* at ¶ 77. Incredulously, MORRISON claimed he felt a "little better." Unlawful conduct and dishonesty can clearly be inferred from this plainly false statement.

### iv.   MALO Continued the Trend of LPN's Completely Ignoring SACCO'S Obvious Demise Other Than to Chart It

SACCO's vitals were not taken again until 5:00 p.m. on the evening of May 19,

2019, by DOROTHEA MALO, LPN.  ¶ *Id* at 29, 70, 71.  Unsurprisingly, SACCO'S pulse

was still extremely high at 125 and he complained of being lightheaded and having no

energy.  Yet, as continues to be the theme with the six nurse defendants at issue, MALO

provided SACCO no treatment at all and chose not to contact a provider even though his

withdrawal symptoms were in fact worsening and included lightheadness, no energy,

restless, nausea/vomiting, decreased appetite, increased fluids.  *Id* at ¶ 29, 55, 64, 71.  In

addition, Plaintiff reiterates that an additional allegation common to each of the six nurse

defendants at issue is they monitored SACCO at a shockingly infrequent rate.  *Id* at ¶ 99.

That MALO chose not to take any other time during the remainder of her shift to take

SACCO's vitals or even check in on him infers an intent to punish.  *Id* at ¶ 98-101.

> **v.   GUSTAFSON Returned and Again Ignored Sacco's Obvious Medical Need**

SACCO was not seen next until seven hours later, at 12:15 a.m. on the morning of

May 20, 2019 when GUSTAFSON returned.  *Id* at ¶ 29.  SACCO complained of

weakness, restlessness, sweating, nausea/vomiting, and again had an extremely high pulse

in the range of 111 to 114.  *Id* at ¶ 29, 70, 71.  Fifteen minutes later, at 12:30 a.m.,

GUSTAFSON charted that he still complains of nausea/vomiting/diarrhea, aches, cold

sweats, dizziness, lightheaded, restless, lack of sleep, decreased appetite, increased fluids,

at risk for detox.  *Id*.  Again, GUSTAFSON did nothing in response to SACCO'S serious

medical need other than to chart it.  GUSTAFSON'S continued failure to do anything in

response to SACCO'S obvious demise rises to a level that far surpasses wanton conduct

and indicates an intent to punish.  *Id* at ¶ 101.  And continuing yet another theme common

between the six nurse defendants, GUSTAFSON chose not to make these her only two encounters with Sacco during her shift.

### vi.     HRUBIEC Ignored Sacco's Obvious and Easily Preventable Demise

KATELYN HRUBIEC, LPN worked the day shift of May 20, 2019 and replaced GUSTAFSON.  HRUBIEC first assessed SACCO at 8:12 a.m.  *Id* at ¶ 29. Unsurprisingly, his obvious signs of severe/late withdrawal persisted:  his pulse was still extremely high at 114, he reported nausea and restlessness, and he was charted as being at risk for detox.  *Id*.  HRUBIEC did not visit SACCO again until over four hours later at 12:55 p.m. on May 20, 2019, at which point his withdrawal symptoms continued worsening.  *Id* at ¶ 29, 64, 71, 82.  SACCO also reported that he had been in jail before, which each of the nurse defendants were already on notice of through his master chart. *Id*.  SACCO had been incarcerated previously and had undergone withdrawal, so he was a known entity to HCDOC and the six nurse defendants at issue.  *Id* at ¶ 66.  Plaintiff's previous dates of incarceration at HCDOC are approximately:  3/14/14 – 3/16/14; 10/17/17 – 10/25/17; 6/22/18 – 6/27/18; and 7/13/18 – 7/18/18.  *Id* at ¶ 67.  The Elliott Health System hospital report states that Plaintiff NICHOLAS SACCO was taking Buprenorphine-Naloxone (Suboxone).  This is a medication prescribed for opiate users. He should have been continued on this medication at HCDOC, yet there is no indication any of the nurses ever considered this or contacted a provider about it.  *Id* at ¶ 68. Plaintiff NICHOLAS SACCO'S symptoms and vital signs throughout withdrawal in previous incarcerations were significantly different than those of May 2019, yet again none of the nurses considered that or informed a provider of it.  *Id* at ¶ 69.

### vii.    COULOMBE only Checked on Sacco Once During His Final Night at HCDOC

Another four hours passed until SACCO was finally seen again at 4:00 p.m. on May 20, 2019, by KATE COULOMBE, LPN.  *Id* at ¶ 29.  Unsurprisingly, SACCO's withdrawal symptoms continued to worsen, including nausea and cold sweats. *Id* at ¶ 29, 64, 70, 71.  He was again charted as being at risk for detox, yet again absolutely nothing was done in response.  *Id*.  Fifteen minutes later, COULOMBE reported that SACCO again complained of nausea and took his vitals, which notably indicated that his pulse had markedly dropped below 100.  *Id*.  Such a significant drop in pulse indicates that SACCO was not only in very late-stage withdrawal, but that he was quickly decompensating.  *Id* at ¶ 29, 43 70, 71.  Inexplicably, not only did COULOMBE do absolutely nothing in response, but she also chose not to even check on him again during her shift.

COULOMBE'S complete failure to act or even monitor SACCO cannot possibly be considered a reasonable professional judgment, especially at this late stage of his demise.  COULOMBE's deliberately indifferent decision not to monitor SACCO precludes there being any notes in the chart as to his demise that night, but we do have the benefit of the testimony of his cellmate, Michael Differ.  Differ observed that on May 20, 2019, SACCO's withdrawal symptoms had worsened to the point that he started to become lightheaded and having a hard time standing on his own two feet at times. *Id* at ¶ 46.  On the night of 5/20/19 during third shift hours, Differ observed Sacco faint/collapse inside of the cell.  *Id*.  Differ advised two correctional officers of this and they came to the cell door and told Sacco to stand up and go lay down on his secondary mattress (on the cell floor next to the bunk).  *Id*.  Differ recalled that Sacco was unable to stand and move on his own.  Then, Differ observed two correctional officers grab Sacco by the back of the shirt and drag him to the mattress on the floor.  *Id*.

**viii.     BANCROFT, the One RN at Issue, Outrageously Did Nothing about the Fact that SACCO'S Death was Near**

After COULOMBE saw SACCO at 4:00 p.m. on May 20, 2019, SACCO was not seen next until over eight hours later at 12:32 a.m. on May 21, 2019.  *Id* at ¶ 46.  It seems clear that this assessment by BANCROFT was done in response to that same fainting episode and with knowledge of the same facts, including that he was unable to stand or move on his own.  BANCROFT's entry notes that he was "diaphoretic" with his "pupils dilated."  *Id* at ¶ 29.  SACCO'S vitals also indicated that his pulse remained much lower than before, and that his blood pressure had charged markedly indicating hypotension.  *Id* at ¶ 29, 70, 71.  At this stage, there can be no doubt that even a layperson would be well aware that SACCO was close to death and would have done at least something, including call a provider or even 911.  *Id* at ¶ 70, 71, 100.  Tragically, even though she was an RN and should have known better than the five LPN's who had previously encountered SACCO, BANCROFT continued the theme of doing absolutely nothing in response other to chart SACCO's demise.  *Id* at ¶ 63.  BANCROFT also outrageously chose not to monitor him again during the remainder of her shift.  SACCO'S chart indicates that BANCROFT had previously made an entry on a different date at 5:30 a.m., so it can be inferred that on May 21, 2019 BANCROFT worked at least that late and likely up through the beginning of the 8:00 a.m. shift.  *Id* at ¶ 29.

Like COULOMBE, BANCROFT'S deliberately indifference decision not to monitor SACCO precludes there being any notes in the chart as to his demise that night, and again we must turn to his cellmate, Differ, for an account of SACCO.  Differ reported that on the morning of May 21, 2019, at approximately 7:30 a.m. he woke to find SACCO still lying on his secondary mattress on the cell floor.  *Id* at ¶ 47.  Differ observed that

SACCO had been vomiting on the cell floor.  *Id.*  At around 8:15 a.m. on May 21, 2019,

NICOLE MASCI, LPN arrived on the unit to conduct medication administration.  *Id* at ¶

47.  "Cellmate stated NS was in 'rough shape.'  NS crawled to the doorway and when

asked, said he was 'not good.'  Appeared lethargic and nauseated.  Vomited green bile.

LPN asked for more medical staff to assist…Relayed to PA Schweiger, and called 911.

PA Schweiger arrived and started chest compressions." *Id.*  It is important to note that PA

Schweiger was pre-scheduled to make his once-a-week visit to HCDOC on Tuesday May

21, 2019, and that he had just arrived to the jail when a nurse chose to finally contact him

about SACCO.  *Id* at ¶ 64, 71.  SACCO quickly became unresponsive and was rushed to

Elliot Hospital around 8:40 a.m.  *Id* at ¶ 29.  On Wednesday, May 22, 2019, at 6:51 p.m.,

Plaintiff NICHOLAS SACCO was pronounced dead.  *Id* at ¶ 26.

## IV.  SACCO'S STATE LAW MEDICAL MALPRACTICE CLAIMS AGAINST THE SIX NURSE DEFENDANTS ARE NOT PRECLUDED AS A MATTER OF LAW

Defendants' arguments regarding Plaintiff's state law medical malpractice claims

largely miss the mark.  Per RSA 507-B:4, the municipal immunity provisions of that

statute only apply to claims against municipal employees if two elements are met: 1) the

employee was acting within the scope of his or her office; and 2) the employee reasonably

believed in the legality of his or her actions.  Plaintiff respectfully submits that his First

Amended Complaint is riddled with allegations that the six nurse defendants at issue did

not reasonably believe that their conduct was lawful.  For example, Plaintiff points to his

dozens of allegations related to his § 1983 claims, including those cited herein and those

found in paragraph 93-101, including:

> The conduct and inactions of the individual defendants,
> acting under color of state law, was done with deliberate
> indifference to plaintiff, NICHOLAS SACCO, and was

> outrageous and shocks the conscience, and was the direct
> and proximate cause of specific, serious and permanent
> bodily and psychological harm, pain and suffering, and
> ultimately death, in violation of NICHOLAS SACCO'S
> rights as guaranteed by 42 U.S.C. § 1983 and the fourteenth
> amendment to the United States Constitution.  Moreover,
> the conduct and inactions of the individual defendants,
> acting under color of state law, was done intentionally,
> maliciously, and sadistically, with deliberate indifference to
> the rights of NICHOLAS SACCO."

*Id* at ¶ 101.

It is not possible for a nurse to intentionally and maliciously violate a patient's constitutional right to medical care, causing him to die a torturous and easily preventable death as a direct result, while also reasonably believing in the legality of their actions.

The same is true for Plaintiff's allegations in paragraphs 113-130, including: "The defendants deliberately refused to accommodate NICHOLAS SACCO'S disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs."  *Id* at ¶ 123.  "Said exclusions and denials by the Defendants were because of his disability and the defendants' perception of his disabling condition." *Id* at ¶ 129.

Defendants do not offer any meaningful discussion of this important threshold issue and instead gloss over it by falsely asserting that "[t]here are no allegations that any of the Nurse Defendants did not reasonably believe that the medical care provided to Sacco while at the VSJ was provide in an unlawful manner."  First, there was no medical care provided to speak of.  Second, what the defendants mean, and what their argument essentially boils down to, is that Plaintiff's First Amended Complaint does not contain those exact magic words.  However, what Defendant misses is that the use of such magic-language, conclusory assertions are not only unnecessary, but they are also disfavored under the federal rules.  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice.  Although for the purposes of a

motion to dismiss we must take all of the factual allegations in the complaint as true,

we are not bound to accept as true a legal conclusion couched as a factual allegation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868 (2009)

(citations omitted).  "While legal conclusions can provide the framework of a complaint,

**they must be supported by factual allegations**. When there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief."  *Id* at 679, 1950.  Plaintiff respectfully

submits that his well-pleaded factual allegations give rise to a plausible suggestion that the

six nurse defendants at issue did not reasonably believe in the legality of their actions.

  The cases that Defendants cite to are not nearly as analogous as they assert.  For

example, in both *Martineau v. Antilus*s and *Donlon v. Hillsborough Cty*: 1) the plaintiff

only asserted state law claims against Hillsborough County, i.e. no state law claims were

asserted against the nurse employees in their individual capacities; and 2) the plaintiff did

not offer any allegations or argument related to 507-B:4 that the nurse employees did not

reasonably believe in the lawfulness of their actions.  In other words, these two cases do

not in any way touch upon this same threshold issue.

  While *Maryea v. Braggs* did at least involve a contention by the plaintiff that the

individual defendants were not entitled to governmental immunity, it is difficult to

imagine a less analogous case from a factual standpoint.  The court's analysis of this issue

repeatedly emphasizes the fact that: "Maryea, on the other hand, has **produced no

evidence** that any of the officer defendants ever failed to acknowledge her complaints or

showed any animus against her. **Nor has Maryea pointed to any evidence** from which a

factfinder could conclude that the officer defendants acted dishonestly or without

faithfulness to their duties and obligations." No. 13-CV-318-LM, 2016 WL 1060226, at *7 (D.N.H. Mar. 15, 2016). Also, in *Maryea*, there was evidence that certain of the defendants actually gave consideration to and/or responded to plaintiff's risk of harm, and that they did not simply disregard it. Conversely, here Plaintiff SACCO has pointed to a plethora of evidence and allegations that the defendants completely disregarded his serious medical needs with deliberate indifference and/or in an intentional, sadistic, and malicious manner.

## V. CONCLUSION

In conclusion, Plaintiff respectfully requests that Defendants' motion be denied, except as to BRYANNA GUE and NICOLE MASCI, who Plaintiff agrees to dismiss.


Respectfully submitted,

ESTATE OF NICHOLAS SACCO
By Its Attorneys,

SHAHEEN & GORDON, P. A.

Dated: March 29, 2021               /s/ Anthony M. Carr
                                    Anthony M. Carr (NH Bar # 267623)
                                    107 Storrs Street
                                    P. O. Box 2703
                                    Concord, NH 03302
                                    (603) 225-7262
                                    acarr@shaheengordon.com


## CERTIFICATE OF SERVICE

I, Anthony M. Carr, Esquire, certify that on this date service of the foregoing document was made upon counsel for all parties via the Court's CM/ECF System.

Dated: March 29, 2021
                                    /s/ Anthony M. Carr
                                    Anthony M. Carr