UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Estate of Nicholas Sacco

      v.                          Civil No. 1:20-cv-447-JL
                                 Opinion No. 2021 DNH 086P
Hillsborough County
House of Corrections, et al.


**MEMORANDUM ORDER**


      Nicholas Sacco tragically perished after experiencing opioid withdrawal while a

pretrial detainee in the custody of the Hillsborough County Department of Corrections.

His Estate has filed this lawsuit to hold the County, eight of its nurses who encountered

Sacco while detained, and the County's outside medical providers legally responsible for

his death.  But the question before the court[1] is whether the nurses' alleged acts and

failures to act are enough to sustain the difficult burden of stating a claim for

constitutionally inadequate medical care and overcome the broad statutory immunity

afforded to New Hampshire government employees.  This court has jurisdiction over the

Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343 because the claims present

federal questions and arise from federal civil rights statutes, and supplemental jurisdiction

over its state law claim under 28 U.S.C. § 1367(a).

---

[1] See Doc. No. 30.  The court previously denied a separate motion to dismiss from the outside
medical providers (doc. no. 10), and those providers, as well as Hillsborough County, have
answered the operative complaint.  See Doc. Nos. 21-23.

The eight nurses (the "Nurse Defendants") argue that the Plaintiff merely states a claim for negligent or inadvertently deficient medical care, and something more is required to support a claim that the medical care was so deficient that it violated Sacco's constitutional rights.  Without facts that could show they did not believe in the legality of their actions, the Nurse Defendants also argue that they are immune from the Plaintiff's state law negligence claim under RSA 507-B:4.

After considering the parties' submissions and hearing oral argument, the court grants the motion in part and denies it in part.  The Plaintiff has agreed to dismiss its claims against defendants Bryanna Gue and Nicole Masci, so the defendants' motion is granted as to those two defendants.  Six Nurse Defendants remain.  The motion is granted as to Nurses Hrubiec, Coulombe, and Morrison and denied as to the other three nurses.

The allegations against Nurses Hrubiec, Coulombe, and Morrison show that Sacco's condition was not clearly worsening during their limited contact with him and did not warrant further medical intervention at that time.  Their actions with respect to Sacco were reasonable and therefore not deliberately indifferent.  By contrast, the allegations against Nurses Malo, Gustafson, and Bancroft suggest that Sacco's serious medical condition was worsening while in their care, there were available treatment avenues to prevent his demise, and they chose not to utilize them.  This is marginally sufficient to state a claim for deliberate indifference and overcome a statutory immunity defense at the 12(b) stage.  Their motion to dismiss is denied.

## I.   Applicable legal standard

To defeat a Rule 12(b)(6) motion, the Plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015). This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013). In ruling on such a motion, the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the Plaintiff's favor. See Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010). The court may also consider judicially noticed documents, matters of public record, and documents introduced by the Plaintiff in its objection to the motion to dismiss or concessions in that objection, without converting the 12(b)(6) motion into a motion for summary judgment. See Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019); Greene v. Rhode Island, 398 F.3d 45, 49 (1st Cir. 2005).

## II.   Background

The court draws the relevant factual background from the Plaintiff's First Amended Complaint (doc. no. 21). At 2:38 p.m. on Thursday, May 16, 2019, Sacco was booked as a pretrial detainee at the Valley Street Jail[2] for theft-related charges and

---

[2] Valley Street is a jail facility in Manchester, New Hampshire operated by the Hillsborough County Department of Corrections. See First Amended Complaint (doc. no. 21), at ¶ 4.

ordered to be detained for 72 hours because the charges resulted in a probation violation.[3]

Because weekend hours are not counted towards the 72-hour hold, Sacco was scheduled

to be released on Tuesday, May 21, 2019.[4]

During the booking process, Nurse Gue, an employee of the County[5] working at

Valley Street, completed a mental health screening for Sacco, during which Sacco denied

drug or alcohol use.[6]  Nurse Gue also noted that Sacco denied "psych history" but had a

history of asthma and used an inhaler, and had a severe allergy to dairy products.[7]  Sacco

was approved to be housed in general population.[8]  On May 17, Nurse Katelyn Hrubiec

attempted to complete a Medical History and Screening form for Sacco, but was unable

to do so because Sacco had a court hearing and had been transported out of the jail.

The next day, at around 9:20 p.m., Sacco complained to Nurse Masci that he was

feeling dizzy and stated that he was detoxing from 5 grams of daily heroin use, with his

last use two days prior on May 16, the day he was booked.[9]  Nurse Masci took Sacco's

---

[3] See id., at ¶¶ 21-22.

[4] Id. at ¶¶ 23-24.

[5] As neither the Nurse Defendants nor the County dispute that the Nurse Defendants were employees of the County during the events in question, the court will assume this fact for purposes of this order.

[6] Id. ¶ 29, at 8 (summary table of Sacco's medical treatment).

[7] Id.

[8] Id.

[9] Id. at 9.

vitals and noted that his sitting pulse was 112 and sitting blood pressure was 128/84.[10]

Nurse Masci placed Sacco on detoxification watch and advised him that he would be

moving cells, to which Sacco responded "no, it's okay, I just need to sleep, you don't

have to do all that."[11]   About an hour later, Nurse Erica Gustafson saw Sacco after he

requested to see a nurse due to asthma symptoms.  Nurse Gustafson recorded Sacco's

pulse as 124 and observed no shortness of breath or wheezing.[12]  Sacco then stated that it

was not actually his asthma that was bothering him, but that he was just not feeling well.

Sacco reported feeling dizzy, stated he was detoxing, and asked to go to the hospital.[13]

Nurse Gustafson told Sacco that she was about to begin detox checks and would follow

up with him when she returned.  She suggested he "relax and stay in bed when possible,"

gave him a Styrofoam cup for hydration, and assured him that the staff would continue to

monitor his vital signs and well-being and would follow up with detox checks while he

was detained.[14]

    At around 11:45 p.m., Nurse Gustafson completed a detox check for Sacco.[15]  She

noted that Sacco had increased appetite, fluids, and sleep, but complained of nausea and

---

[10] Id.

[11] Id.  After the staff began detox watch on May 18, Corrections Officers passed Sacco's cell to
observe him every fifteen minutes throughout the remaining time Sacco was detained at Valley
Street.  Id., ¶ 29, at 10-13.

[12] Id.

[13] Id. at 9-10.

[14] Id. at 10.

[15] Id.

vomiting.  Sacco's standing blood pressure was 112/74 and his standing pulse was 128.  Nurse Gustafson reported that he was alert and oriented, upright, and had a "steady strong gait."[16]  She further noted that Sacco should remain on detox watch as he was "at risk for detox."[17]  Less than two hours later, at around 1:00 am on May 19, Nurse Gustafson returned to Sacco's cell.  During this encounter, Sacco reported that he forgot to previously tell the nursing staff that was he was also detoxing from alcohol and "benzos."[18]  He also told Nurse Gustafson that he took "benzos" without a prescription and that he tried to get as much as possible every day off the street.  Nurse Gustafson noted that Sacco's vital signs were within normal limits, he was alert and oriented, upright, and had a steady gait.[19]  She then collected a urine sample from Sacco, which was positive for fentanyl and negative for all other substances.[20]

　　　Two hours later, Sacco requested a nurse because he was complaining of restlessness and leg cramps.  Nurse Gustafson advised that these were typical detox symptoms.  Sacco requested medication or to go to the hospital, but Nurse Gustafson declined to hospitalize him and advised him that no medications are given during third

---

[16] Id.

[17] Id.

[18] Id.

[19] Id.

[20] Id.

shift and that the staff would continue to monitor him.[21]  At around 8:15 a.m. that

morning, Nurse Laura Morrison completed a detox check for Sacco.[22]  During the check,

Sacco complained of nausea and vomiting and had a standing blood pressure of 112/70

and standing pulse of 122.[23]  Nurse Morrison returned to Sacco's cell around 1pm that

afternoon.  Sacco reported no complaints of nausea, vomiting, or diarrhea and stated he

was doing "a little better."[24]

    At 5:00 p.m. on May 19, Nurse Dorothea Malo completed a detox check for

Sacco.  During the check, Sacco complained of restlessness, agitation, nausea, vomiting,

lightheadedness, decreased appetite, increased fluid intake, and no energy.[25]  Sacco had a

standing pulse of 125 and a standing blood pressure of 114/76.[26]  Nurse Malo advised to

continue the detox watch.

    Just after midnight on May 20, Nurse Gustafson completed another detox check

for Sacco.[27]  During the check, Sacco complained of weakness, aches, cold sweats,

dizziness, lightheadedness, decreased appetite, restlessness, lack of sleep, nausea,

diarrhea, and vomiting.  His standing pulse was 111 and his standing blood pressure was

---

[21] Id.

[22] Id. at 11.

[23] Id.

[24] Id.

[25] Id. at 11-12.

[26] Id. at 11.

[27] Id. at 12.

117/70. Nurse Gustafson reported that Sacco was alert and oriented and displayed a slow, steady upright gait.[28] She noted that he was "at risk for detox" and advised to continue the detox watch.

Sacco was next examined at 5:30 a.m. on May 20 by Registered Nurse Luella Bancroft.[29] Sacco had requested a nurse after complaining of shortness of breath and lightheadedness. Nurse Bancroft examined Sacco and noted that his lungs were clear bilaterally and he did not appear in distress. She recommended he slow down his breathing.

Less than three hours later, Nurse Hrubiec performed a detox check on Sacco.[30] His standing pulse was 114 and his standing blood pressure was 114/68. During the check, Sacco reported nausea and restlessness, but denied vomiting or diarrhea. He also indicated that he had increased his meals.[31] Later that day, just before 1:00 p.m., Nurse Hrubiec completed a Medical History and Screening form for Sacco.[32] During the screening, Sacco reported that he used 5 grams of heroin every day, last used heroin on May 16, and also used tobacco. He further reported that he became restless when he

---

[28] Id.

[29] Id.

[30] Id. at 13.

[31] Id. Nurse Hrubiec's notes from this encounter state "increase meals and fluids(?)", suggesting that Sacco stated he was increasing his meals, but not necessarily his fluids.

[32] Id. It is unclear why the nursing staff waited until May 20 – four days into Sacco's detention – to complete his medical history screening.

stopped taking drugs and was currently detoxing and feeling nauseous.  Sacco also stated

that he had asthma and used an inhaler, and had been in jail before.  Nurse Hrubiec noted

on a physical assessment form that Sacco's pulse was 108 and his blood pressure was

128/84.[33]

Around 4:00 p.m. on May 20, Nurse Kate Coulombe completed a detox check for

Sacco.[34]  Sacco's standing pulse was 98 and his standing blood pressure was 112/64.

During the check, Sacco complained of nausea and cold sweats, but denied vomiting or

diarrhea, and reported that he was drinking fluids and eating.  He also stated that he "last

used heroin on Saturday."[35]  Nurse Coulombe advised to continue the detox watch.

Sacco's next detox check was around 12:30 a.m. on May 21.[36]  During the check –

conducted by Nurse Bancroft – Sacco complained of restlessness and sweating and had a

standing pulse of 101 and a standing blood pressure of 100/50.  Nurse Bancroft noted that

Sacco was diaphoretic (sweating heavily) and his pupils were dilated.[37]

Nearly eight hours later, Nurse Masci arrived at Sacco's cell to conduct

medication administration.[38]  Sacco's cellmate first interacted with Nurse Masci and

---

[33] Id.

[34] Id.

[35] Id.

[36] Id. at 14.

[37] Id.

[38] Id.

stated that Sacco was in "rough shape."  Sacco then crawled to the doorway and stated he

was "not good."  He appeared lethargic and nauseated and vomited green bile.  Nurse

Masci asked for additional medical staff to assist and Nurse Morrison arrived shortly

thereafter and took Sacco's vital signs.  The nurses then relayed Sacco's condition to a

Physician's Assistant, Defendant Christopher Schwieger, and called 911.  Schwieger

arrived and began chest compressions on Sacco, who was jaundiced and no longer

responsive.  Nurse Masci administered Narcan and the staff attached an automated

external defibrillator to Sacco, which registered "no shock advised."  Defendant

Schwieger continued CPR until emergency medical services arrived.[39]

EMS transported Sacco to Elliott Hospital shortly after 9:00 a.m.  On May 22 at

6:51 p.m., Sacco was pronounced dead.[40]  His autopsy report listed a cause of death as

"complications from opioid withdrawal."[41]  Sacco's mother, as the Administrator of his

estate, filed this lawsuit on April 10, 2020.

## III.   <u>Analysis</u>

The Nurse Defendants move to dismiss the two counts against them for failure to

state a claim upon which relief can be granted.  First, the Nurse Defendants argue that the

factual allegations in the operative complaint, even if taken as true and construed in

Plaintiff's favor, cannot support a § 1983 claim for deliberately indifferent medical care

---

[39] <u>Id.</u>

[40] <u>Id.</u> at ¶ 26.

[41] <u>Id.</u> at ¶ 27.

(Count 1).  Second, as for the state law medical negligence claim (Count 4), the Nurse Defendants contend that they are immune from liability under RSA 507-B:4 because the complaint does not establish that they did not reasonably believe in the legality of their actions.  As detailed below, while the creditable factual allegations in the complaint and reasonable inferences drawn therefrom do not show that the nurses acted in a manner to punish Sacco, for three of the nurses these allegations state a claim for deliberately indifferent medical care and medical negligence.

The court begins with the Plaintiff's civil rights claim under 42 U.S.C. § 1983 for constitutionally inadequate medical care.

### A.    § 1983 claim for deliberately indifferent medical care

The parties dispute the required elements of proof for a pretrial detainee's claim of deliberately indifferent medical care.  Thus, before turning to the merits of the Nurse Defendants' arguments, the court will determine the proper test to be applied to the Plaintiff's claim.

#### 1.    The elements of the claim

The parties agree that a § 1983 claim for deliberately indifferent medical care brought by a criminal pretrial detainee involves the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  They differ, however, as to the level of proof required to establish such a claim.  The Plaintiff argues that the court should apply an "objective unreasonableness" standard based on the Supreme Court's decision in Kingsley v. Hendrickson, 576 U.S. 389 (2015).  The Nurse Defendants counter that Kingsley did not change the standard, and the court should apply the traditional two-part

subjective and objective test for deliberate indifference claims.  The court agrees with the Nurse Defendants.

Kingsley was an excessive force claim brought by a pretrial detainee, and the court expressly limited its holding to such claims.  See 576 U.S. at 391-92, 397 ("The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that . . ."); id. at 397 ("We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.") (emphasis added); id. at 402 (finding an objective standard appropriate "in the context of excessive force claims brought by pretrial detainees" and declining to address whether to continue using "a subjective standard in the context of excessive force claims brought by convicted prisoners").

Neither the Supreme Court nor the First Circuit Court of Appeals has extended the Kingsley holding to other contexts.  In the absence of authority explicitly changing the standard, the court must rely on existing First Circuit precedent in deliberate indifference cases, which includes "both objective and subjective components."  Couchon v. Cousins, No. CV 17-10965-RGS, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018) (declining to apply Kingsley's objective standard to pretrial detainee's conditions of confinement claim under Fourteenth Amendment); see also Suprenant v. Rivas, 424 F.3d 5, 18-19 (1st Cir. 2005) (applying two-part objective and subjective test for detainee's conditions of confinement claim); Burrell v. Hampshire Cty., 307 F.3d 1, 7-8 (1st Cir.

2002) (applying two-part objective and subjective test for detainee's deliberately indifferent medical care claim).[42]

Indeed, following Kingsley, the First Circuit Court of Appeals has continued to apply the two-part objective and subjective test to deliberately indifferent medical care claims by pretrial detainees.  See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64 (1st Cir. 2016); see also Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (applying two-part objective and subjective test to deliberate indifference claim by pretrial detainee under the "Eighth Amendment").  Notably, the Miranda-Rivera court acknowledged that Kingsley changed the standard for excessive force claims and proceeded to apply an objective reasonableness standard to the plaintiff's excessive force claim, but did not apply it to his deliberate indifference claim.  813 F.3d at 70-71.  Courts in this district have similarly applied Kingsley to excessive force claims, but not deliberate indifference claims.  See, e.g., Silva v. Elliot Hosp., No. 14-CV-394-SM, 2020 WL 4001931, at *13

---

[42] The court recognizes there is a circuit split on whether Kingsley's objective unreasonableness standard should extend to deliberately indifferent medical care claims, with the Ninth, Second, and Seventh Circuits applying the objective standard, and the Fifth, Eighth, and Eleventh Circuits declining to apply Kingsley's objective standard to detainee medical care claims.  See Estate of Vallina v. Cty. of Teller Sheriff's Office, 757 F. App'x 643, 646 (10th Cir. 2018) (noting circuit split).  The court also acknowledges Chief Judge McCafferty's prediction that based on Kingsley "it is likely that civil detainees no longer need to show subjective deliberate indifference in order to state a due process claim for inadequate conditions of confinement." Gomes v. US Dep't of Homeland Sec., Acting Sec'y, 460 F. Supp. 3d 132, 148 (D.N.H. 2020).  This statement, however, was dicta because the outcome in Gomes was the same under either standard and Judge McCafferty later "decline[d] to resolve whether Kingsley changed the applicable standard for due process claims brought by civil detainees." Id.  Absent controlling authority from the Supreme Court or First Circuit Court of Appeals, this court will not attempt to predict whether Kingsley's objective standard applies to deliberately indifferent medical care claims under the Due Process Clause of the Fourteenth Amendment by criminal pretrial detainees.

(D.N.H. July 15, 2020).  The court will accordingly apply the traditional two-part standard here.[43]

"Fourteenth Amendment substantive due process requires the government to provide" adequate medical care to pretrial detainees.  Miranda-Rivera, 813 F.3d at 74 (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983)).  While the "boundaries of this duty have not been plotted exactly . . . it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner."  Id.; see also Burrell, 307 F.3d at 7 (noting that "the standard to be applied" in Fourteenth Amendment cases by pretrial detainees "is the same as that used in Eighth Amendment cases").  Government officials violate the Eighth or Fourteenth Amendments "if they display deliberate indifference to a prisoner's [or pretrial detainee's] serious medical needs."  Miranda-Rivera, 813 F.3d at 74 (internal quotations omitted).  These claims contain both objective and subjective components.  The objective inquiry is whether the detainee had a "serious medical need," that is, a medical need "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily

---

[43] Despite urging the court to apply Kingsley's objective unreasonableness standard to this case, the Plaintiff does not explain how that standard should be applied to its deliberate indifference claim.  Perhaps for good reason, as the Kingsley court merely held that "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable," and noted that this is not a mechanical standard but one that turns on the facts and circumstances of each case, and depends on a number of non-exclusive factors.  576 U.S. at 396-97.  The Plaintiff also cites Youngberg v. Romeo, 457 U.S. 307 (1982) for the proposition that criminal pretrial detainees are entitled to more considerate treatment and conditions of confinement than convicted criminals.  See Doc. 31, at 3.  But Youngberg involved a civilly committed individual and the quote that the Plaintiff relies on actually starts with "Persons who have been involuntarily committed" not "criminal pretrial detainees."  See Youngberg, 457 U.S. at 321-22.  Quoted accurately, Youngberg does not help the Plaintiff here.

recognize the necessity for a doctor's attention." Id.  The Nurse Defendants concede for the purposes of this motion that Sacco had a serious medical need, so the court will assume that the Plaintiff meets this element of the test.

The parties' dispute centers on the subjective component, which "requires the plaintiff to show that prison officials, in treating [Sacco's] medical needs, possessed a sufficiently culpable state of mind," namely, "one that amounts to deliberate indifference to the [Sacco's] health or safety." Zingg, 907 F.3d at 635 (citing Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015)).  "Deliberate indifference in this context" can take several forms, and "may be shown by the denial of needed care as punishment" or that the defendant had "actual knowledge of impending harm, easily preventable," and failed to take the steps that would have prevented that harm.  Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006)). The Plaintiff can make this showing "by demonstrating that the defendant provided medical care that was 'so inadequate as to shock the conscience,'" or that was "so clearly inadequate as to amount to a refusal to provide essential care." Zingg, 907 F.3d at 635 (quoting Feeney, 464 F.3d at 162 and Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)).  "[D]eliberate indifference may also take the form of 'wanton' or criminal recklessness in the treatment afforded." Zingg, 907 F.3d at 635; see also Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (noting that deliberate indifference may be shown by a "wanton disregard" to a detainee's needs).[44]

---

[44] As a fallback, the Plaintiff asks the court to apply the standard used in Battista (a case involving a civilly committed individual) if it does not apply the Kingsley standard, presumably

To act, or fail to act, with deliberate indifference, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  A factfinder may conclude that a prison official was aware of a substantial risk of serious harm based on circumstantial evidence that the official perceived the risk or "based on the fact that the risk was obvious." Miranda-Rivera, 813 F.3d at 74.  This element therefore "requires evidence that the failure in treatment was purposeful." Kosilek v. Spencer, 774 F.3d 63, 83 (1st Cir. 2014).  "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa, 485 F.3d at 156 (citing Feeney, 464 F.3d at 161-62); see also Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir. 2011) ("[M]isjudgment, even negligent misjudgment, is not deliberate indifference.").

And, even if a prison official is aware of a serious medical risk, "they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Burrell, 307 F.3d at 8.  Where it is shown that an official

---

because the Battista court posited that a "more plaintiff-friendly standard" for deliberate indifference claims may apply.  645 F.3d at 453 (suggesting that because plaintiff was civilly committed, the court could look at "whether the defendant failed to exercise a reasonable professional judgment").  The court ultimately did not adopt that objective, "plaintiff-friendly" standard and neither will this court, for the reasons discussed above.  The court recognizes, however, that the Plaintiff may establish deliberate indifference by proving that the officials displayed a "wanton disregard [for the prisoner's medical needs] sufficiently evidenced by denial, delay, or interference with prescribed health care." Id. (internal quotations omitted).

"was deliberately indifferent to a serious medical need of a pretrial detainee, no further mens rea of the official — whether intent or motivation — is necessary to state a substantive due process claim." Miranda-Rivera, 813 F.3d at 74 (citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)).

### 2. The merits of the claim

The Nurse Defendants argue that the Plaintiff's complaint lacks the requisite factual allegations to show that each nurse was deliberately indifferent to Sacco's serious medical needs. The Plaintiff responds with several overarching points. First, it contends that Sacco received no medical care at all and therefore the Nurse Defendants' collective failure to act was deliberately indifferent.[45] Second, it argues that because five of the six remaining Nurse Defendants are Licensed Practical Nurses or LPNs, "it is impossible for [them] to argue that they made a reasonable professional judgment under the circumstances . . . when they were fundamentally unqualified to make any such independent determinations."[46] And third, it faults the Nurse Defendants for waiting "over two days" to initiate the jail's withdrawal protocol for Sacco.[47] The court is not persuaded by any of these arguments for the following reasons.

As for the qualifications of the Nurse Defendants, the Plaintiff's complaint does not allege that any of them lacked appropriate qualifications, or, more importantly, that

---

[45] See Plaintiff's Objection (doc. no. 31) at 11.

[46] Id. at 14.

[47] See Doc. no. 21, at ¶ 73.

an alleged lack of qualifications affected the medical care they provided to Sacco.  The

court therefore cannot conclude that the alleged lack of qualifications of LPNs should

lead to an inference of deliberate indifference.  See Torraco, 923 F.2d at 234 (failure to

provide psychiatric care to suicidal inmate, as opposed to care from a psychologist, was

not a sufficiently dangerous omission to raise an inference of deliberate indifference to

the inmate's mental health and safety needs).  Next, the alleged delay in initiating the

withdrawal protocol was not deliberately indifferent because the nursing staff was unable

to complete Sacco's medical screening upon his arrival at the jail due to a court

appearance, and Sacco did not notify jail staff that he was a daily heroin user until May

18.  The court also disagrees that Sacco received no medical care from the remaining

Nurse Defendants during his detention, as the Plaintiff's complaint demonstrates

otherwise.[48]  In any event, and significantly, the relevant inquiry is not whether the nurses

collectively provided inadequate care.  Rather, the question is whether each nurse,

through their "own individual actions, has violated the Constitution."  Air Sunshine, Inc.

v. Carl, 663 F.3d 27, 33 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676

---

[48] Indeed, almost immediately after Sacco first disclosed to jail staff that he was a daily heroin
user, Nurse Masci placed him on detox watch.  See Doc. no. 21, at 9.  Once placed on detox
watch, nursing staff conducted several detox checks, which involved physically assessing
Sacco's condition, discussing his reported symptoms, and taking his vital signs.  And nurses
visited Sacco other times to assess his medical complaints or symptoms.  This can hardly be
described as a "complete denial of medical care."  It may also explain why the Plaintiff has
agreed to voluntarily dismiss its claim against Nurse Masci, who not only put Sacco on detox
watch as soon as she learned of his heroin use, but also advised Sacco that he would be moving
to a different cell to facilitate the detox watch.  Sacco declined the offer to move cells and told
Nurse Masci that he "just need[ed] to sleep."  Id. at 9.

(2009)).  The court accordingly addresses whether each nurses' care was "so clearly inadequate as to amount to a refusal to provide essential care."  Zingg, 907 F.3d at 635.

> a)   *Nurse Katelyn Hrubiec*

Nurse Hrubiec attempted to complete a medical history screening for Sacco on May 17, but was unable to because Sacco had to be transported out of the jail for a court appearance.  Her next encounter with Sacco was a detoxification check shortly after 8 a.m. on May 20.  Sacco complained of nausea and restlessness during the check, but denied vomiting or diarrhea and reported he was increasing his meals and possibly his fluids.  He had a standing pulse of 114 and a standing blood pressure of 118/72.  Nurse Hrubiec noted "no issues reported" and advised to continue with "detox" watch.  Several hours later on May 20, Nurse Hrubiec completed Sacco's medical history screening and took his vitals (pulse of 108 and blood pressure of 128/84), which were similar to those recorded earlier in the day.

Nurse Hrubiec knew that Sacco was on detox watch and in the process of withdrawing from heroin.  The Plaintiff argues that Sacco presented symptoms to Nurse Hrubiec that indicated he was in late or severe withdrawal, such as a high pulse, restlessness, and nausea.[49]  It further argues that Sacco's symptoms had worsened by the

---

[49] See Doc. no. 31, at 19.  The Plaintiff repeatedly insists that Sacco was in the "late" or "severe" stages of withdrawal during the better part of his detention and that this was a life-threatening condition that required additional medical care.  Yet it does not explain what late or severe withdrawal is, when it begins or how long it lasts, how it compares to other stages of withdrawal, why it requires some level of additional care or treatment, or what that additional care or treatment would entail.  By contrast, the Nurse Defendants contend that Sacco's symptoms were common or expected signs of withdrawal and no additional treatment was required.  While the court must accept the Plaintiff's allegation that Sacco was in late or severe withdrawal at this stage of the proceedings and the Nurse Defendants have conceded for purposes of this motion

time Nurse Hrubiec saw him later in the day on May 20, and that her failure to inform a physician or other provider about this alleged worsening condition – to either treat Sacco or prescribe medication for him – was deliberately indifferent.[50]  If in fact Sacco's condition appeared to be worsening and Nurse Hrubiec did nothing about it, that could constitute deliberate indifference; however, that does not appear to be the case based on the factual allegations in the Plaintiff's complaint.

Sacco's vital signs at around 1 p.m. on May 20 were close to his vital signs earlier that morning, which does not suggest a worsening in symptoms or conditions.  Similarly, Sacco's vital signs shortly after 8 a.m. on May 20 were nearly identical to his vital signs during his last detox check at 12:15 a.m. on May 20.  And his reported symptoms at 8 a.m. were not worse or drastically different from the prior encounter.  In fact, his reported symptoms at 8 a.m. suggested an improvement in conditions from the prior encounter, during which Sacco complained of weakness, restlessness, sweating, nausea, vomiting, diarrhea, aches, dizziness, lightheadedness, and decreased appetite.  This indicates that Nurse Hrubiec did not know that Sacco's condition was worsening or that his demise was imminent and "easily preventable" at the time she examined him, and refutes the notion that she failed to take steps that would have prevented that harm.  Ruiz-Rosa, 485 F.3d at 156 (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006)).  Nor

---

that Sacco had a serious medical need the conclusory nature of many of the Plaintiff's allegations is concerning and unhelpful.

[50] Id.

can the court draw the inference from these allegations that Nurse Hrubiec acted in a manner to punish Sacco.

The Plaintiff further argues that because Sacco reported to Nurse Hrubiec on the medical screening form that he had been in jail before,[51] she should have known that he had previously undergone withdrawal as an inmate or detainee.  But the court cannot infer from Sacco's report of being in jail before that he was a "known entity" to Nurse Hrubiec or the other nurses, that Nurse Hrubiec knew of Sacco's prior dates of incarceration, or, most importantly, that she knew that Sacco had previously experienced withdrawal as an inmate.  While the court accepts the Plaintiff's allegation that Sacco reported on his screening form that he had been in jail before, the court declines to make significant inferential leaps the Plaintiff requests in order to find support for its claim. Nor is there any indication that Nurse Hrubiec or any of the other nurses knew that Sacco was taking Suboxone, as the Elliot Health System hospital report allegedly stated.[52]  The Plaintiff does not allege that Sacco notified the nurses or any other jail staff that he was taking Suboxone.  For all of these reasons, the court finds that the Plaintiff's complaint is missing the requisite factual allegations to support the conclusion that Nurse Hrubiec's treatment of Sacco was so clearly inadequate as to amount to a refusal to provide

---

[51] Doc. no. 21, at 13 (reporting on medical history and screening form that Sacco "Has been in jail before.").

[52] Doc. no. 31, at 19.

essential care.  The Plaintiff's deliberate indifference claim against Nurse Hrubiec is accordingly dismissed.

        *b)*     *Nurse Kate Coulombe*

Nurse Coulombe had one interaction with Sacco during his detention on May 20 at 4:00 p.m.  She understood that Sacco was on detox watch and charted his standing pulse at 98.  Sacco reported nausea and cold sweats, but denied vomiting or diarrhea, reported that he was drinking fluids and eating and had no further issues.  The Plaintiff characterizes these symptoms as worsening, but does not explain why they were any worse than the last time the nurses checked Sacco.[53]  It also points out that Sacco's pulse "markedly" dropped below 100, which indicated that Sacco was "quickly decompensating."[54]  Sacco's pulse had dropped to 98, which is objectively not a "marked" drop below 100.  The court is not persuaded that these conclusory allegations should have suggested to Nurse Coulombe that Sacco was quickly decompensating.

    The Plaintiff also faults Nurse Coulombe for not checking on Sacco again during her shift.  But there was nothing about Sacco's condition during Nurse Coulombe's one encounter with him that should have prompted her to check on him more frequently.  And other jail staff, such as corrections officers, were checking on Sacco every fifteen minutes

---

[53] This is a common issue throughout the Plaintiff's complaint and objection to the Nurse Defendants' motion to dismiss.  The Plaintiff repeatedly concludes that Sacco's condition was worsening throughout his detention, but the factual allegations suggest otherwise.  While Sacco reported a high pulse and nausea for most of his detention, his other symptoms fluctuated.  At times, he would complain of certain symptoms and at other times, those symptoms would dissipate and he would indicate that his condition was improving.

[54] Doc. no. 31, at 20.

throughout their shift, as required by the jail's detox watch procedures.[55]  If Sacco's condition appeared to be worsening during one of these checks, corrections officers presumably would have notified the nursing staff.  The Plaintiff argues that Sacco's condition on the evening and night of May 20 was in fact worsening based on reports from Sacco's cellmate, Michael Differ.  The Plaintiff does not allege, however, that Differ notified Nurse Coulombe or other nurses about Sacco's apparent decline, or that Nurse Coulombe learned of Differ's account during her shift on May 20 when she would have been in a position to intervene.  The only allegation of Sacco's cellmate interacting with nursing staff was at 8:15 a.m. on May 21, when Nurse Masci reported that his cellmate stated that Sacco "was in 'rough shape.'"[56]

The court therefore finds that Nurse Coulombe's alleged failure or "decision not to" monitor Sacco more frequently during her shift was not deliberate indifference to his serious medical needs.  The Plaintiff's claim against Nurse Coulombe is accordingly dismissed.

---

[55] Nothing in the jail's "Detox Procedure" – quoted in the operative complaint – suggests that Nurse Coulombe should have monitored Sacco more frequently.  Doc. no. 21, at ¶ 56.  The portion of the document quoted in the complaint states that "[i]nmates detoxing from opiates and alcohol may need pharmacological management based upon their symptoms and vital signs.  The assessment of these individuals is important, thus they need to be monitored closely and frequently."  This policy does not specify how frequently, or by whom, the monitoring must occur.  And as noted above, the corrections officers monitored Sacco every fifteen minutes and nothing from Nurse Coulombe's encounter with Sacco indicated that more frequent monitoring was required.

[56] Doc. no. 21, at 14.

c)   *Nurse Laura Morrison*

Nurse Morrison's interactions with Sacco were similarly limited.  On May 19 at 8:15 a.m., she performed a detox check and recorded Sacco's pulse as 122.  She also reported that was complaining of nausea and vomiting.  Later that day, Nurse Morrison checked on Sacco and he reported that he was doing "a little better" and had no complaints of nausea, vomiting, or diarrhea.  These allegations do not suggest that Sacco was "clearly decompensating further into the later stages of withdrawal," as the Plaintiff vaguely concludes.  And finally, on May 21, Nurse Morrison responded to Nurse Masci's call for additional assistance at Sacco's cell when he became unresponsive.  The complaint provides little detail about Nurse Morrison's actions during her encounter with Sacco on May 21, and the Plaintiff does not allege that her care during this encounter was deliberately indifferent.

Instead, the Plaintiff argues that the alleged inadequate care provided by Nurse Gustafson, who Nurse Morrison relieved on May 19, "appl[ies] equally" to Nurse Morrison.[57]  The court disagrees.  As noted above, the court must evaluate the conduct of each nurse individually and cannot impute Nurse Gustafson's alleged misconduct to Nurse Morrison.  Beyond attempting to lump Nurse Morrison in with her colleagues, the Plaintiff alleges that Nurse Morrison's lack of additional follow up with Sacco constitutes deliberate indifference.  The Plaintiff's own allegations belie this argument.  In her second encounter with Sacco on May 19, Nurse Morrison reported that he was doing

---

[57] Doc. no. 31, at 17.

better and not experiencing vomiting, nausea, or diarrhea.  This does not suggest that

Sacco was "going into a life-threatening drug withdrawal" at that time.[58]  And as with

Nurse Hrubiec, Sacco's reported symptoms indicate his condition was improving.  The

Plaintiff speculates that Nurse Morrison's report of Sacco feeling better was "plainly

false" because Sacco had just had a phone conversation with his girlfriend where he

reported the travails of his withdrawal symptoms.  The court cannot credit such

speculation, particularly where there is no evidence or even an allegation that Nurse

Morrison knew about Sacco's phone call with his girlfriend or the substance of that

conversation during her shift on May 19.  The factual allegations supporting a claim of

deliberately indifferent medical care against Nurse Morrison are plainly deficient and the

Plaintiff's claim against her is therefore dismissed.

*d)*    *Nurse Dorothea Malo*

Nurse Malo assisted in ordering Sacco an Albuterol inhaler on May 16, but the

Plaintiff does not allege there was anything deliberately indifferent about this.  She also

examined Sacco on May 19 at 5 p.m.  During this encounter, Sacco reported multiple

symptoms such as restlessness, agitation, nausea, vomiting, lack of energy, and

lightheadedness.  Sacco's vitals were not significantly changed from his prior detox

check, but his pulse remained very high at 125.  His symptoms, however, appear to have

worsened, as during his prior check at 1:10 p.m. earlier that day, he reported no

complaints of nausea, vomiting, or diarrhea, and stated he was doing a "little better."  The

---

[58] Id.

court can infer from these allegations that Sacco's condition was worsening, Nurse Malo was aware of this decline, and she could and should have taken steps to prevent that decline, such as notifying a physician or licensed provider.

Sacco's factual allegations support the inference that Sacco's demise was "easily preventable" to Nurse Malo and yet she failed, per the allegations in the complaint, to take steps to prevent that demise. See Ruiz-Rosa, 485 F.3d at 156. While Nurse Malo's alleged failure to follow up with Sacco more frequently during her shift does not support the inference that she intended to punish him, the allegations of her limited care – which the court must accept as true at this stage – appear to be "so clearly inadequate as to amount to a refusal to provide essential care." Zingg, 907 F.3d at 635. Nurse Malo's motion to dismiss the Plaintiff's deliberate indifference claim is therefore denied.

### e)   *Nurse Erica Gustafson*

Nurse Gustafson interacted with Sacco the most during his detention, beginning in the overnight shift on May 18 into May 19 and resuming just after midnight on May 20. During their first encounter on May 18, Sacco requested a nurse due to symptoms related to his asthma, but when Nurse Gustafson arrived, Sacco admitted that it was not his asthma that was bothering him, but that he was not feeling well from detoxing and wanted to go to the hospital. On May 19, Sacco reported to Nurse Gustafson that he was also detoxing from alcohol and "benzos" and was a frequent user of benzos. Nurse Gustafson conducted a urinalysis, which came back positive for fentanyl but negative for all other substances. Two hours later, Sacco requested a nurse complaining of restlessness and leg cramps and requested again to go to the hospital or to be given

medication.  On May 20, Nurse Gustafson performed a detox check for Sacco, during which he complained of weakness, aches, cold sweats, dizziness, lightheadedness, decreased appetite, restlessness, lack of sleep, nausea, diarrhea, and vomiting, and registered a standing pulse of 111.

Nurse Gustafson's alleged response to Sacco's symptoms and complaints – particularly on May 18 and 19 – appears to be so clearly inadequate that it amounts to a refusal to provide essential care and therefore supports a claim for deliberately indifferent medical care.  For example, knowing that Sacco was on detox watch and detoxing from daily heroin use, in response to his request to go to a hospital on May 18, Nurse Gustafson told him to "relax and stay in bed," gave him a Styrofoam cup, and told him that staff would continue to monitor him.  On May 19, after learning that Sacco was potentially detoxing from other substances and after Sacco again requested to be hospitalized or to receive medication, Nurse Gustafson told him that no medications would be given on third shift.  While jail staff are not expected to accede to every inmate's request to go to the hospital, Sacco's pleas at least suggest he was suffering and in need of more substantial medical attention.  And Sacco did not request to be hospitalized during his encounters with other nurses, suggesting that he was in particular distress during his time with Nurse Gustafson.

Moreover, there were avenues aside from hospitalization or calling 911 that Nurse Gustafson could have utilized – including those recommended by the jail's policy and procedures for detoxing inmates.  Instead of taking those measures, she simply told Sacco that he would continue to be monitored.  This is especially true of Sacco's request for

medication, which is expressly recommended in the jail's policy as part of the course of treatment for detoxing inmates.  It is of no moment that Nurse Gustafson as an LPN could not prescribe medication for Sacco or allegedly could not administer such medication during third shift.  She could have called a physician or other provider authorized to prescribe medication.  See Putnam v. Hillsborough County, No. 19-cv-664-AJ (D.N.H. Feb. 13, 2020) (unpublished) (Johnstone, M.J.) ("At a minimum, Nurse Rennie, faced with the medication discrepancy and Putnam's deteriorating condition, could have contacted supervisory personnel about Putnam's care"); Taylor v. Garcia, No. 11 C 7386, 2015 WL 5895388, at *6 (N.D. Ill. Oct. 6, 2015) ("Even assuming Nurse Garcia lacked the power to remedy Plaintiff's Elavil lapses herself, that would not excuse her from action. At a minimum, Nurse Garcia could have told her supervisors about the Elavil lapses.  Based upon the record, she does not appear to have done even that.") (citing Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010)).  Faced with an inmate showing visible symptoms of opioid withdrawal and requesting hospitalization or medication to alleviate these symptoms (i.e. impending harm and a means to prevent that harm), Nurse Gustafson chose to do very little in response.  Although these allegations – which the court must accept as true at this stage – do not indicate an intent to punish as Plaintiff alleges, they support a claim for deliberate indifference against her and her motion to dismiss is denied.

f)    *Nurse Luella Bancroft*

Nurse Bancroft examined Sacco on May 20 at 5:15 am, following his complaints of shortness of breath and lightheadedness.  Nurse Bancroft checked Sacco's lungs, which were clear bilaterally.  She recommended he slow down his breathing.  The Plaintiff does not allege that this encounter shows Nurse Bancroft's deliberate indifference and the court agrees.

Nurse Bancroft also performed a detox check on May 21 at 12:32 a.m., the day Sacco's condition worsened to the point where he became unresponsive and was taken to the hospital by EMS.  Sacco's pulse was 101 and his blood pressure was 100/50.  He was also restless, sweating profusely, and his pupils were dilated.  The Plaintiff alleges that these symptoms suggest that Sacco was "close to death."[59]  While the court is not willing to go that far, it does appear that Sacco's symptoms were arguably worse or at least as serious as they were during his prior detox check on May 20 at 4 p.m.  The court certainly cannot conclude on this record that Sacco's condition was improving when Nurse Bancroft evaluated him on May 21.  Absent clearer evidence of improving conditions, the court finds that the Plaintiff has alleged that Nurse Bancroft had actual knowledge of Sacco's allegedly-worsening condition, that his demise was easily preventable through certain medical interventions, and that she failed to take steps that would have prevented that demise.  These facts – which the court must accept as true at

---

[59] Doc. No. 31, at 21.

this stage – may show deliberate indifference.  Nurse Bancroft's motion to dismiss is denied.

g)      *Additional note*

Notwithstanding its decision to keep certain nurses in the case, the court observes for context that it is not sufficiently apprised about the appropriate level of care that should be administered to someone who is in the late or severe stages of opioid withdrawal, or that such care was in fact deliberately not provided here by Nurses Malo, Gustafson, or Bancroft.  Additional evidence or expert opinion may prove at a later stage in the case that these nurses acted reasonably in response to Sacco's condition.  The court simply cannot make that determination on this record, in response to a 12(b) motion, when it must accept as true and draw all reasonable inferences from the factual allegations in the Plaintiff's complaint.

**B.      Medical Negligence**

The Nurse Defendants also seek dismissal of the Plaintiff's negligence claim based on the government employee immunity codified in RSA 507-B, et seq.  Under RSA 507-B:5, "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute."  A "governmental unit" is "any political subdivision within the state including any county ... or departments or agencies thereof." RSA 507-B:1, I.  This immunity extends to individual government officials or employees, "so long as said employee or official was acting within the scope of his or her office and reasonably believed in the legality of his or her actions."  RSA 507-B:4.

The Plaintiff does not dispute that: (1) the County is a "governmental unit"; (2) its claim is for bodily injury or personal injury; and (3) the Nurse Defendants were employed by the County and acting within the scope of their office at the time of the events in question.  The sole issue related to immunity is therefore whether the Plaintiff's complaint alleges facts demonstrating that the Nurse Defendants did not reasonably believe in the legality of their actions.

The Plaintiff argues that its complaint is "riddled with allegations" that the remaining six Nurse Defendants did not reasonably believe in the legality of their actions, and therefore, RSA 507-B:4 does not apply.[60]  The Nurse Defendants disagree, and assert that the complaint is devoid of any allegations that they did not reasonably believe that the medical care they provided to Sacco was unlawful.  The Plaintiff acknowledges that its complaint is missing the "magic words" from RSA 507-B:4, but contends that other allegations sufficiently prove that the nurses did not reasonably believe in the legality of their actions.  Some of the Nurse Defendants have the better argument.

A municipal employee reasonably believes in the legality of her actions if she "subjectively believed that . . . her conduct was lawful and such belief was objectively reasonable."  Farrelly v. City of Concord, 168 N.H. 430, 444 (2015).  The lack of a reasonable belief in this context means more than negligence; the employee must have "acted with a higher level of culpability, i.e., recklessly or wantonly."  Id. at 445.  As the New Hampshire Supreme Court has observed, recklessness is "conduct evincing

───────────────

[60] Doc. no. 31, at 22.

disregard of or indifference to consequences under circumstances involving danger to life or safety of others, although no harm was intended." Kukesh v. Mutrie, 168 N.H. 76, 83 (2015) (internal quotation marks omitted).  And wanton conduct is a "willful disregard of safety or utter indifference to the consequences." Beaulieu v. New Hampshire Governor, No. 16-CV-471-JD, 2018 WL 5830848, at *5 (D.N.H. Nov. 7, 2018) (DiClerico, J.). Moreover, an employee's belief in the lawfulness of her act is objectively reasonable unless its unlawfulness "would have been apparent to an objectively reasonable [nurse] standing in the defendants' shoes." Farrelly, 168 N.H. at 446 (brackets and emphasis omitted) (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004)).

The Plaintiff points to the paragraphs of its complaint outlining its deliberate indifference (93-101) and ADA (113-130) claims and argues that these allegations show that the Nurse Defendants could not have reasonably believed in the legality of their actions.  But these are legal conclusions that parrot the elements of the cause of action, which the court cannot accept as true in deciding this motion.  See Day v. Hurley, No. 12-CV-317-LM, 2014 WL 1794895, at *13 (D.N.H. May 6, 2014) (McCafferty, J.) ("Counts V and VI do allege, in a conclusory fashion, that the conduct of Officers Hurley and Macie was 'willful and wanton,' but otherwise, Counts V and VI do little if anything more than recite the elements of the causes of action they assert, a pleading strategy that is most assuredly disfavored.") (citing Rodríquez–Vives v. P.R. Firefighters Corps, 743 F.3d 278, 283 (1st Cir.2014)).

Merely alleging that something is outrageous, malicious, sadistic, or shocking to the conscience is not enough.  See Est. of Cadman v. Dennis, No. 16-CV-202-AJ, 2018

WL 587857, at *5-6 (D.N.H. Jan. 29, 2018) (Johnstone, M.J.) ("Despite Kirkham's repeated use of the word 'reckless,' nothing in his affidavit suggests that Dennis's conduct approached this level of culpability.  Indeed, it is undisputed in the record that Dennis decided to shoot Cadman precisely because he believed Cadman posed a danger to life or safety of others. Thus, no reasonable trier of fact could conclude that Dennis's actions were subjectively unreasonable under the circumstances.").  Rather, the complaint must allege specific conduct that satisfies the elements of the causes of action, and for purposes of defeating an immunity defense, conduct that shows each Nurse Defendant could not have reasonably believed in the legality of their actions.

For largely the same reasons the court cannot dismiss the Plaintiff's deliberate indifference claims against Nurses Malo, Gustafson, and Bancroft, it also cannot dismiss the negligence claims against them on immunity grounds.  See Beaulieu v. New Hampshire Governor, No. 16-CV-471-JD, 2018 WL 3193234, at *13 (D.N.H. June 28, 2018) (DiClerico, J.) ("Deliberate indifference to a prisoner's substantial risk of serious harm may also constitute wanton or reckless conduct.") (citing Feeney, 464 F.3d at 162 and Zingg v. Grobiewski, 2017 WL 4364179, at *4 (D. Mass. Sept. 29, 2017)). Confronted with clear, objective signs that Sacco's already-serious medical condition was worsening during their encounters with him, these nurses chose to effectively do nothing to mitigate the situation when they knew or should have known that certain interventions could have improved Sacco's condition.  This is not only suggestive of negligence, but also conduct evincing purposeful disregard or indifference to the consequences of not intervening in circumstances involving potential danger to Sacco's life or safety.  See

Kukesh, 168 N.H. at 83; Beaulieu, 2018 WL 5830848, at *5.  While there is no indication Nurses Malo, Gustafson, and Bancroft intended any harm to Sacco, the allegations – which the court must accept as true at this stage – are enough to show reckless or wanton behavior, which counsels against a finding that these nurses reasonably believed in the legality of their actions.

As for Nurses Hrubiec, Coulombe, and Morrison, none of the factual allegations regarding their interactions with Sacco suggested that his condition was worsening and warranted further intervention, so their decision to continue to monitor Sacco on detox watch was not wanton or reckless and therefore shows that they reasonably believed in the legality of their actions.  As a result, these nurses are entitled to immunity under RSA 507-B:4, and their motion to dismiss the Plaintiff's negligence claim is granted.

## IV.    Conclusion

For the reasons set forth above, the Nurse Defendants motion to dismiss[61] is GRANTED as to Nurses Hrubiec, Coulombe, Morrison, Masci, and Gue, and DENIED as to Nurses Malo, Gustafson, and Bancroft.  Counts 1 and 4 are dismissed with prejudice as to Defendants Hrubiec, Coulombe, Morrison, Masci, and Gue.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

---

[61] Doc. no. 30.

34

Dated:          May 20, 2021

cc:     Anthony Carr, Esq.
        Donald L. Smith, Esq.
        Todd J. Hathaway, Esq.
        Abby Tucker, Esq.