UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joanne Sacco, as administrator of the
Estate of Nicholas Sacco

       v.

American Institutional Medical Group, et al.

Civil No. 1:20-cv-447-JL
Opinion No. 2022 DNH 074

**MEMORANDUM ORDER**

This case concerns whether, and to what extent, medical providers contracted to deliver and maintain reasonable and medically necessary care to pretrial detainees at a county jail may be liable if one of those detainees experiences opioid withdrawal at the jail and later dies. Plaintiff Joanne Sacco, as the Administrator of her son Nicholas Sacco's Estate (the "Estate"), filed suit against the County that operates the jail, several of its nurses who provided care to Sacco while detained, and the outside physician and physician's assistant who contracted with the County to provide medical care at the jail (as well as the entity they own). After several rounds of motion practice and some parties settling[1], only the plaintiff's claims under 42 U.S.C. § 1983 for constitutionally inadequate medical care and common law negligence against the outside providers remain. This court has jurisdiction over the plaintiff's federal claim under 28 U.S.C. §§ 1331 and 1343 because the claim presents a federal question and arises from a federal civil rights statute, and supplemental jurisdiction over its state law claim under 28 U.S.C. § 1367(a).

---

[1] The plaintiff has resolved its claims against Defendants Hillsborough County Department of Corrections, Dorothea Malo, Luella Bancroft, and Erica Gustafson.

The outside providers – American Institutional Medical Group, LLC, Christopher Braga, M.D., and Christopher Schwieger, PA-C[2] (the "AIMG Defendants") – move for summary judgment, arguing that the record evidence, even when construed in the light most favorable to the plaintiff, cannot support a claim for deliberately indifferent medical care that violates the substantive due process clause of the Fourteenth Amendment.  The AIMG Defendants also argue that under these circumstances, they did not owe a tort duty of care to Sacco as a matter of law.[3]

After considering the parties' submissions and hearing oral argument, the court grants the motion as to the § 1983 claim and denies it as to the negligence claim.  Correctional medical care that violates the Constitution, regardless of which theory of deliberate indifference liability the plaintiff asserts, requires some degree of purposeful behavior directed at the inmate.  Such intentional or purposeful conduct from Dr. Braga or PA Schwieger towards Sacco is missing from this case.  Deliberate indifference is plainly not negligence.  Nevertheless, viewing the record in the light most favorable to the plaintiff, the court cannot conclude that the AIMG Defendants did not owe a duty of care to Sacco under the unique facts and circumstances presented here.  Dr. Braga and PA Schwieger took on a wide range of duties under the services agreement with the County, which made them generally responsible for the inmate medical care at Valley Street Jail.  Defendants' attempt to downplay its responsibilities is unavailing (at this

---

[2] PA Schwieger passed away on January 21, 2022.  See Suggestion of Death (doc. no 51).  The court recently granted the plaintiff's motion to substitute PA Schwieger's estate as a party is pending (doc. no. 69).  The court refers to this defendant as "PA Schwieger" for purposes of this order.

[3] The AIMG Defendants also argue that they are entitled to qualified immunity on the plaintiff's § 1983 claim and ask the court to decline to continue exercising supplemental jurisdiction over the state law negligence claim if it dismisses the federal claim.  As explained below, the qualified immunity question is moot and the court exercises its discretion to maintain supplemental jurisdiction over the negligence claim.

procedural juncture).  Because genuine factual disputes exist about the scope of the duty,

whether the AIMG Defendants breached their duty, and whether that breach caused Sacco's

untimely death, summary judgment is inappropriate on the plaintiff's negligence claim.

## I.   <u>Applicable legal standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor

at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable

law.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary

judgment motion, the court "views all facts and draws all reasonable inferences in the light most

favorable to the non-moving party."  Id.

Where, as here, the plaintiff bears the ultimate burden of proof, once the movant has

made the requisite showing, it can no longer "rely on an absence of competent evidence, but

must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."

Torres–Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007).  That is, the plaintiff

"'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific

facts showing that there is a genuine issue' of material fact as to each issue upon which [it]

would bear the ultimate burden of proof at trial."  Santiago-Ramos v. Centennial P.R. Wireless

Corp., 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 256 (1986)).

In the alternative, the plaintiff seeks relief under Fed. R. Civ. P. 56(d).  That rule provides

that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

present facts essential to justify its opposition, the court may:  (1) defer considering the motion

or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Id.

## II.   **Background**

The following facts are undisputed, unless otherwise noted.  See L.R. 56.1(b) ("All properly supported material facts set forth in the moving party's factual statement may be deemed admitted unless properly opposed by the adverse party.").[4]

### A.   **Valley Street Jail**

The County operates the Valley Street Jail in Manchester, New Hampshire and employs a staff of nurses to provide medical care to inmates and detainees at the jail.  It also contracts with outside entities to provide medical services at the jail.  In 2016, AIMG entered into an agreement with the County to "deliver and maintain reasonable and medically necessary medical care to the inmates" and detainees at Valley Street "in accordance with NCCHC/ACA standards, and the Policies and Procedures of the HCDOC."[5]  AIMG is a New Hampshire limited liability company comprised of Dr. Braga and PA Schwieger.

---

[4] Plaintiff responds to many of the facts asserted by the AIMG Defendants by stating that it "disputes," "objects," or "strongly objects" to them.  See doc. no. 44 at 62-64.  But the plaintiff offers no contradictory evidence to properly rebut many of these allegations.  For example, the plaintiff "disputes AIMG's offered 'fact' that 'there is no evidence that VSJ staff attempted to contact AIMG Defendants about Decedent's detox signs and symptoms, but failed to respond," but offers no contrary evidence of its own. Id. at 64.  Counsel deposed the Nurse Defendants during discovery and presumably asked whether they contacted Dr. Braga or PA Schwieger.  Had the nurses testified that they did in fact contact Dr. Braga or PA Schwieger, the plaintiff would have had that evidence at its disposal and could have cited it in its summary judgment objection.  The court finds plaintiff's counsel's colorful, and at times embellished, tone in his summary judgment papers unhelpful.

[5] Services Agreement (doc. no. 39-2) at 1.  "NCCHC" stands for the National Commission on Correctional Health" and "ACA" stands for the American Correctional Association.  The agreement was set to expire on June 30, 2019, but it appears that the parties renewed it for a new term.

**B.    AIMG's Services Agreement with the County**

The contractually required medical care included, "at a minimum; performing routine medical/physical exams, providing medical treatment and ordering studies, tests, and ancillary services that are required consistent with aforementioned standards and policies and procedures."[6]  The agreement also required the AIMG providers to "provide services on scheduled workdays according to" mutually agreeable times "for a minimum of 12 hours per week on site at" Valley Street.[7]  And the County agreed to "provide reasonable and necessary supplies, equipment and physical space for [AIMG's] services."  In May 2019, an AIMG provider was typically present at Valley Street on Tuesdays, and the jail would set up two daily times for nurses to call an AIMG provider for routine medication orders, paperwork review, or discussing other concerns that the nurses wished to raise about particular inmates or detainees.[8]

AIMG's responsibilities under the agreement also included:

- "[R]easonably document[ing] all medical services provided by the Provider, referrals and record reviews in the inmate's medical record" and reviewing and re-evaluating "those cases requiring on-going medical and/or pharmaceutical attention, as appropriate and consistent with the aforementioned standards, policies and procedures and standard of care";

- Serving "as a member of various Facility committees, and upon reasonable request, attend[ing] meetings within the Health Services Department and HCDOC";

---

[6] Id.

[7] Id.

[8] See Deposition of Christopher Schwieger (doc. no. 44-17) at 58:14-15; Deposition of Denise Hartley (doc. no. 44-13) at 106:10-18, 136:18-21.

- Overseeing "the Facility's Quality Assurance program, and assist[ing] in establishing Quality Assurance standards and audit criteria";

- "[D]evelop[ing] and conduct[ing] in-service education programs a minimum of 2 times annually and upon reasonable request by the Facility";

- Consulting with the pharmacy and monitoring "all in-patient hospitalizations to evaluate appropriateness of admission, length of stay, and reasonable follow up care";

- Consulting and collaborating "with the Health Services Administrator, Nurse Practitioner and/or Physician's Assistant, Mental Health Staff, Dentist, and Nursing Staff, to assist in meeting the medical and/or mental health needs of the inmates"; and

- Providing "assistance and clinical input with regards to the operations of the Health Services Department."

In addition, AIMG was required to be "available to assist the Facility/Health Services Administrator, upon reasonable request[,] in the development of, and annual review of clinical policies, procedures, protocols and annual disaster plan."  The agreement further obligated AIMG to recommend changes to policies, procedures and protocols "consistent with evolving standards of care and professional requirements, but the Facility will be solely responsible for such policies, etc."

Dr. Braga and PA Schwieger were "directly responsible to the [County's] Superintendent and/or his designee for the delivery of medical care," but maintained "sole responsibility and accountability for [their own] medical diagnosis' and/or treatment decisions."  AIMG also had to maintain professional liability and malpractice insurance for the duration of the agreement. Under the agreement, AIMG was entitled to service fees of $315,000 for the first year, $324,450 for the second year, and $334,183.50 for the third year.

6

The parties agreed that AIMG was an independent contractor of the County and nothing in the agreement would be "construed to create principal/agent, employer/employee, master/servant, lessor/lessee, partnership or joint venture relationship[s] between [AIMG] and the Facility."  To that end, each party to the agreement was "solely responsible for the conduct of their own employees, officials, officers, directors, contractors, agents, and/or representatives."

Denise Hartley, the County's Health Services Administrator, described the AIMG providers' role at Valley Street as follows:

> To maintain and monitor, deliver, oversee necessary medical care of the inmates. Provide services such as physical assessments, chronic disease management, acute care needs. And to document those interactions. To assist and put into place protocols, certain protocols, certain medical procedures to make sure that they provide care within the standards of care. Provide education services to the nursing staff, as needed. To oversee the medical care of the inmates.[9]

When AIMG began providing medical services at Valley Street, two written policies or protocols relating to treatment of withdrawing inmates existed:  (1) the "Standing Orders for Opiate Withdrawal Protocol"[10]; and (2) the "Detox Procedures."[11]  AIMG did not create these policies, but Dr. Braga reviewed them with jail administrators and deemed them appropriate.[12]  Neither Dr. Braga nor PA Schwieger recommended changes to the policies prior to Sacco's detention in May 2019.  After Sacco's death, however, AIMG requested that the jail start using

---

[9] See doc. no. 44-13 at 43:6-14.

[10] See Standing Orders (doc. no. 44-24).

[11] See Detox Procedures (doc. no. 44-27).

[12] See Deposition of Christopher Braga, M.D. (doc. no. 44-20) at 15, 86.

the "Clinical Opioid Withdrawal Scale" or "COWS" system for assessing the severity of an inmate's withdrawal symptoms and the jail presently uses that system.[13]

### C.    Training or education of the jail's nursing staff

In 2016, at the beginning of AIMG's tenure as Valley Street's outside medical provider, Dr. Braga and PA Schwieger met with the nursing staff to discuss detox procedures, opiate misuse disorder in jail settings, and other issues relating to inmate medical care at the jail.[14] After that initial meeting and through the time of Sacco's detention in May 2019, AIMG did not develop or conduct formal training or education programs for the nursing staff at Valley Street. Dr. Braga and PA Schwieger occasionally provided "informal" education to the nurses about inmate medical care, including withdrawal care.[15]  These were not organized training programs or sessions, however.  Rather, the discussions consisted of the AIMG providers offering feedback or responding to questions from the nurses.[16]  The AIMG providers have also attended monthly nursing staff meetings, but the record is unclear about whether those meetings occurred before or after Sacco's detention and death.

AIMG relies on the nursing staff to initiate the withdrawal protocols and standing orders and notify one of the AIMG providers if an inmate's medical condition worsens or requires more involved treatment.[17]  Jail health administration provides new nurses with the AIMG providers'

---

[13] See Hartley Depo. (doc. no. 44-13) at 131-32.

[14] Nurse Defendant Dorothea Malo attended the 2016 meeting with AIMG.  Nurse Defendants Luella Bancroft and Erica Gustafson, however, did not attend the meeting because they began working at the jail in 2017 and 2018, respectively.

[15] Schwieger Depo. (doc. no. 44-17) at 19; Braga Depo. (doc. no. 44-20) at 29.

[16] Braga Depo. (doc. no. 44-20) at 29.

[17] Malo Depo. (doc. no. 44-15) at 22.

names and contact information and, as part of the on-boarding process or during the course of

their employment, instructs the nurses on when and how to contact the AIMG providers.[18]

Administrator Hartley encourages new nurses to introduce themselves to the AIMG providers or

speak with them by telephone to understand who the nurses are working with and become

initiated with the various processes for inmate medical care.[19]

### D.   Sacco's detention

On the afternoon of Thursday, May 16, 2019, Sacco was booked as a pretrial detainee at

Valley Street for theft-related charges and detained for 72 hours because the charges resulted in a

probation violation.   Because weekend hours are not counted toward 72-hour holds, Sacco was

scheduled to be released on Tuesday, May 21.[20]

As part of the booking process, a nurse completed a mental health screening for Sacco,

during which he denied drug or alcohol use.  The nurse noted that Sacco denied "psych history"

but had a history of asthma, used an inhaler, and had a severe allergy to dairy products.  Sacco

also signed a "Consent to Treatment" form, which authorized the County, "its Health Services

employees, subcontractors, independent contractors and/or agents," including AIMG, to

"perform any diagnostic laboratory procedures, examinations, x-rays, administer medications,

---

[18] See Gustafson Depo. (doc. no. 44-14) at 17, 71-72; Malo Depo. (doc. no. 44-15) at 144-145;
Bancroft Depo. (doc. no. 44-16) at 76.  This instruction falls into the category of informal on-the-
job education, as opposed to formal training or educational sessions.

[19] Hartley Depo. (doc. no. 44-13) at 108-09.

[20] Sacco had been detained at Valley Street several times in the past, including in 2014, 2017,
and 2018.  During these detentions, jail medical staff – but not Dr. Braga or PA Schwieger –
provided medical treatment and placed him on "detox watch" for opiate withdrawal in 2017.  See
Sacco Inmate Medical Record (doc. no. 44-3).

and perform any other medical procedures recommended by the Physician, Dentist, and/or Physician Assistant."[21]  Sacco was approved to be housed in general population.

On May 17, another nurse attempted to complete a jail Medical History and Screening form for Sacco, but was unable to do so because Sacco had been transported out of the jail for a court event.[22]  That day, Dr. Braga prescribed Sacco an Albuterol inhaler at the request of the nursing staff.[23]  Dr. Braga did not physically examine Sacco or review his inmate medical records from prior detentions at Valley Street.[24]  After writing the Albuterol prescription, Dr. Braga had no further involvement in Sacco's medical care during his May 2019 detention.

On May 18, at around 9:20 p.m., Sacco informed the nursing staff for the first time that he was detoxing from 5 grams of daily heroin use, with his last use two days prior.[25]  A nurse placed Sacco on detoxification watch and advised him that he would be moving cells, to which Sacco responded "no, it's okay, I just need to sleep, you don't have to do all that."[26]  The nurse did not notify either AIMG provider that she was placing Sacco on detoxification watch.  At the time of Sacco's detention, placing a detainee on "detox watch" meant that a nurse would check

---

[21] See Consent to Treatment (doc. no. 44-19).

[22] See doc. no. 44-2 at 9.

[23] See doc. no. 44-3 at 17; see also Braga Depo. (doc. no. 44-20) at 9, 46.

[24] Affidavit of Christopher Braga, MD (doc. no. 39-3) at ¶ 9.  Dr. Braga described the medical care he provides to inmates as "indirect care."  When an inmate is withdrawing from drugs or alcohol, Dr. Braga does "not get involved directly with patient care . . . [i]n other words, [he's] not in the building when someone's typically withdrawing.  [He's] not – [he's] not interviewing them, talking to them, laying hands on them."  Braga Depo. (doc. no. 44-20) at 40-41.

[25] Sacco later reported to one of the nurses that he was also a regular user of benzodiazepines or "benzos," however a urinalysis conducted during his detention was negative for benzodiazepines.

[26] See Sacco Detox Flow Sheet (doc. no. 44-11).

the detainee at least once every shift and corrections officers would pass by the detainee's cell every fifteen minutes.  The nurses' checks involved taking the detainee from their cell to the dayroom for observation and assessment of withdrawal symptoms, taking the detainee's vital signs (blood pressure, pulse, and respirations), and recording observed symptoms and reported symptoms from the detainee in nursing notes and the "detox flow sheet."[27]  Aside from the regular detox checks, nurses also visited Sacco's cell to respond to his requests for medical attention.

As Sacco's detention and detox watch continued, none of the nurses contacted Dr. Braga or PA Schwieger to update them on Sacco's care or inquire about whether his condition warranted additional medical interventions.  And Dr. Braga and PA Schwieger did not independently inquire with the nursing staff about Sacco's condition.  For reasons not clear from the record, a nurse first conducted a complete medical screening for Sacco on May 20.  During the screening, Sacco reported that he used 5 grams of heroin every day, last used heroin on May 16, and also used tobacco.  He further reported that he became restless when he stopped taking drugs and was currently detoxing and feeling nauseous.  Sacco also stated that he had asthma and used an inhaler, and had been in jail before.

None of the nurses who examined Sacco during his detention reviewed his medical records from prior incarcerations at Valley Street.  The nurses also did not initiate "Standing Orders" for opiate withdrawal for Sacco, which would have allowed them to administer Sacco a tapering dose of "Vistaril" and potentially a dose of "Bentyl," depending on Sacco's symptoms.[28]  Sacco was not provided any medications for his withdrawal symptoms.

---

[27] See Standing Orders (doc. no. 44-24).

[28] See doc. no. 44-24.  Vistaril is used to alleviate nausea, while Bentyl is used to alleviate abdominal cramping.  See Braga Depo. (doc. no. 44-20) at 66.  These medications are designed

Corrections staff instead monitored Sacco, and the nurses performed their regular checks and provided him with a cup to encourage hydration.  By the morning of Tuesday, May 21, however, Sacco's condition had worsened.

PA Schwieger would typically spend Tuesday mornings at Valley Street and was at the jail on the morning of May 21.  While sitting in the medical office in the jail's infirmary, PA Schwieger received a "code" call and responded directly to Sacco's cell.  There, he encountered Sacco in a "very poor," unresponsive and jaundiced condition.  PA Schwieger brought Sacco down onto the floor and noted that he had no pulse and was not breathing.  PA Schwieger then began CPR on Sacco.  One of the nurses administered Narcan to Sacco and attached him to an automated external defibrillator but was unable to revive him.  PA Schwieger and the staff continued "basic life support" measures until emergency medical services arrived, as one of the nurses had called 911.[29]  This was PA Schwieger's only interaction with Sacco during his May 2019 detention at Valley Street.

EMS transported Sacco to Elliott Hospital shortly after 9:00 a.m.  The following evening, Sacco was pronounced dead.   His autopsy report listed a cause of death as "complications from opioid withdrawal."[30]  The parties, however, dispute his precise cause of death.[31]

---

to provide comfort or relieve the severity of certain symptoms, but not prevent them or stop the withdrawal process entirely.  Id. at 71, 130.

[29] See Sacco Inmate Medical Record (doc. no. 44-3) at 20-22.

[30] See Cause of Death Report (doc. no. 44-5) at 1.

[31] Compare Report of Todd R. Wilcox, MD, MBA, FACCP (doc. no. 56-2) ("Mr. Sacco died of a sudden cardiac arrhythmia mostly likely due to hyperkalemia (elevated potassium level)."), with Report of Thomas A. Andrew, MD (doc. no. 44-6) ("the death of Nicholas Sacco was due solely to withdrawal from opioids under conditions of enforced abstinence in a setting of incarceration").

### E.    Procedural background of this litigation

Sacco's mother, as the Administrator of his estate, filed this lawsuit in April 2020.  The court denied motions to dismiss for failure to state a claim from the AIMG Defendants and some of the County defendants, but granted the motion as to several individual nurse defendants.[32] The plaintiff recently settled its claims against the remaining nurse defendants and the County, leaving only the claims against the AIMG Defendants scheduled for trial.

During discovery, the parties disclosed expert witnesses who offered opinions relating to the AIMG Defendants' potential liability in this case.  Relevant here, the plaintiff disclosed Dr. Jonathan M. Giftos, a board-certified internist, addiction medicine specialist and self-proclaimed "correctional health expert"[33] and Rebecca E. Leuthy, RN, MSN, CNS, CCHP, a correctional health specialist with a focus on nursing care in correctional settings.[34]  The AIMG Defendants disclosed Dr. Todd Wilcox, a correctional healthcare specialist currently serving as the Medical Director for the Salt Lake County (Utah) Jail System and Eric N. Wells, PA-C, a practicing physician assistant in correctional settings and Certified Correctional Healthcare Professional.[35]

### III.    <u>Analysis</u>

The AIMG Defendants offer four grounds for summary judgment.  First, they contend that no rational jury could find that Dr. Braga and PA Schwieger were deliberately indifferent to Sacco's serious medical needs.  Second, they argue that even if the plaintiff establishes that one

---

[32] <u>See</u> August 28, 2020 Endorsed Order denying AIMG Defendants' motion to dismiss; Memorandum Order (doc. no. 33).

[33] <u>See</u> Affidavit of Jonathan M. Giftos, MD, AAHIVS (doc. no. 44-8).

[34] <u>See</u> Leuthy Report (doc. no. 44-9).

[35] <u>See</u> Wilcox Report (doc. no. 56-2); Wells Report (doc. no. 56-3).

or both of them violated Sacco's constitutional rights, those rights were not clearly established at the time of the alleged violation and qualified immunity therefore bars the constitutional claim. Next, they argue that if the court dismisses the plaintiff's federal claim, it should decline to exercise supplemental jurisdiction over the remaining state law medical negligence claim.  And finally, they assert that the court should nevertheless dismiss the medical negligence claim for lack of duty.  The court addresses each argument in turn.

### A.       § 1983 claim for deliberately indifferent medical care

"Fourteenth Amendment substantive due process requires the government to provide" adequate medical care to pretrial detainees.  Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016) (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983)).  While the "boundaries of this duty have not been plotted exactly . . . it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Id.; see also Burrell v. Hampshire Cty., 307 F.3d 1, 7 (1st Cir. 2002) (noting that "the standard to be applied" in Fourteenth Amendment cases by pretrial detainees "is the same as that used in Eighth Amendment cases").  Government officials violate the Eighth or Fourteenth Amendments "if they display deliberate indifference to a prisoner's [or pretrial detainee's] serious medical needs." Miranda-Rivera, 813 F.3d at 74 (internal quotations omitted).  These claims contain both objective and subjective components.  The objective inquiry is whether the detainee had a "serious medical need," that is, a medical need "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id.  The AIMG Defendants concede for the purposes of this motion that Sacco had a serious medical need, so the court will assume that the plaintiff meets this element of the test.

The parties' dispute centers on the subjective component, which "requires the plaintiff to show that prison officials, in treating [Sacco's] medical needs, possessed a sufficiently culpable state of mind," namely, "one that amounts to deliberate indifference to [Sacco's] health or safety." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (citing Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015)). "Deliberate indifference in this context" can take several forms, and "may be shown by the denial of needed care as punishment" or that the defendant had "actual knowledge of impending harm, easily preventable," and failed to take the steps that would have prevented that harm. Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006)); see also Estelle v. Gamble, 429 U.S. 97, 104-105 (1976) (deliberate indifference may "manifest" in the official's "response to the prisoner's needs or by . . . in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.").

Plaintiff can make this showing "by demonstrating that the defendant provided medical care that was 'so inadequate as to shock the conscience,'" or that was "so clearly inadequate as to amount to a refusal to provide essential care." Zingg, 907 F.3d at 635 (quoting Feeney, 464 F.3d at 162 and Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991)). "[D]eliberate indifference may also take the form of 'wanton' or criminal recklessness in the treatment afforded." Zingg, 907 F.3d at 635; see also Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (noting that deliberate indifference may be shown by a "wanton disregard [for the prisoner's medical needs] sufficiently evidenced by denial, delay, or interference with prescribed health care") (internal quotations omitted).

To act, or fail to act, with deliberate indifference, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference.'" Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). A prison official may be aware of a substantial risk of serious harm based on circumstantial evidence that the official perceived the risk or "based on the fact that the risk was obvious." Miranda-Rivera, 813 F.3d at 74 (citing Farmer, 511 U.S. at 842). In addition to awareness, the plaintiff must proffer "evidence that the failure in treatment was purposeful." Kosilek v. Spencer, 774 F.3d 63, 83 (1st Cir. 2014). "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa, 485 F.3d at 156 (citing Feeney, 464 F.3d at 161-62); see also Ramos v. Patnaude, 640 F.3d 485, 490 (1st Cir. 2011) ("[M]isjudgment, even negligent misjudgment, is not deliberate indifference.").

The operative question is whether each AIMG provider, through their "own individual actions, has violated the Constitution," not whether they are collectively liable or whether AIMG as an entity is liable. Air Sunshine, Inc. v. Carl, 663 F.3d 27, 33 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). The court thus addresses whether each individual AIMG provider's care was "so clearly inadequate as to amount to a refusal to provide essential care." Zingg, 907 F.3d at 635.

### 1.    Dr. Braga and P.A. Schwieger[36]

Plaintiff asserts a deliberate indifference claim against the individual AIMG providers. It does not, however, assert a Monell claim against AIMG the entity arising from alleged systemic,

---

[36] Plaintiff does not raise separate arguments as to why each AIMG provider was deliberately indifferent to Sacco's serious medical needs, instead grouping the two providers together as "AIMG" or the "AIMG Defendants."

policy, or training failures.[37]  As for Dr. Braga and PA Schwieger, the plaintiff alleges in the operative complaint that they "knew or should have known that the plaintiff was suffering a serious medical condition but were deliberately indifferent to this condition."[38]  It further alleges that they:

> failed to adequately monitor the plaintiff, failed to adequately treat the plaintiff, failed to assess the plaintiff, and failed to promptly obtain proper emergency medical care for the plaintiff and otherwise exhibited a deliberate indifference to [Sacco's] serious medical condition . . . [and] outrageously ignored the fact that [Sacco] was going into a life-threatening drug withdrawal.[39]

Plaintiff acknowledges in its summary judgment objection that neither AIMG provider had actual knowledge of Sacco's serious medical condition.[40]  Indeed, it is undisputed that no nurse or other jail staff, prior to PA Schwieger's only interaction with Sacco, notified Dr. Braga or PA Schwieger that Sacco was in the withdrawal protocol and experiencing symptoms of opioid withdrawal.  Without more, no rational factfinder could conclude that either AIMG provider was deliberately indifferent.  See Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir. 2010) (granting summary judgment on deliberate indifference claim against prison official because the record "showed absolutely no evidence of the [defendant's] personal involvement with or knowledge of [the inmate's] medical care").

---

[37] See Monell v. Dep't of Soc. Services, 436 U.S. 658, 694 (1978) (municipality may be liable under § 1983 for "action pursuant to official municipal policy of some nature," or municipal custom or practice that "caused a constitutional tort"); Canton v. Harris, 489 U.S. 378, 388, 391 (1989) (municipality may be liable for constitutional violations arising from its failure to train employees).

[38] Doc. no. 21 at ¶ 98.

[39] Id. at ¶¶ 99-100.

[40] Doc. no. 44 at 64.

Similarly, the plaintiff's allegation that the AIMG providers "should have known" of Sacco's condition is "insufficient" to show deliberate indifference.  Alsina-Ortiz v. Laboy, 400 F.3d 77, 82 (1st Cir. 2005).  Plaintiff nevertheless pivots to theories of deliberate indifference liability not plead in its operative complaint.  First, it alleges that the AIMG providers willfully blinded themselves to the substantial risk of serious harm Sacco faced.  And second, it contends that the providers are liable under a "supervisory liability" theory.  While not originally asserted,[41] the court considers and rejects each of these theories for the reasons explained below.

**Willful blindness**.  While proving deliberate indifference ordinarily requires the defendant's actual knowledge or notice that the detainee's serious medical need posed a substantial risk of serious harm, willful blindness to that risk may also suffice.  See, e.g., Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992) ("Deliberate indifference requires a showing by the plaintiff that the public official had actual knowledge, or was willfully blind, to the serious risk that a detainee would commit suicide."); Manarite By & Through Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992) (describing mental state for deliberate indifference claim as "recklessness . . . in the appreciably stricter criminal-law sense, requiring actual knowledge [or willful blindness] of impending harm, easily preventable") (quoting DeRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)) (alteration in original).

A showing of willful blindness, as the name suggests, requires some evidence of intentional conduct and "a level of culpability higher than a negligent failure to protect from" the risks of serious medical needs.  Bowen, 966 F.2d at 17 (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir.1991)).  Thus, "it is not enough for plaintiff to prove that [Dr. Braga

---

[41] Although the plaintiff did not raise these theories of liability in its operative complaint, it appears that the parties focused on these issues during discovery and the AIMG Defendants addressed them in their summary judgment papers.  Thus, the court considers them in this order.

or PA Schwieger] reasonably should have known of [the] risk[s]" associated with Sacco's serious medical needs.  Jones v. McKenzie, No. 10-CV-152-JL, 2011 WL 6300679, at *5 (D.N.H. Dec. 16, 2011) (quoting Wallis v. City of Worcester, No. 03–11318, 2007 WL 690050, at *4 (D. Mass. Mar. 1, 2007)).

The record contains no evidence from which a reasonable factfinder could conclude or infer that Dr. Braga or PA Schwieger intentionally avoided learning information about Sacco's health needs.  See Alsina-Ortiz, 400 F.3d at 82 (willful blindness is "directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent"). And it is speculation to say (as the plaintiff alleges in its briefing) that the AIMG providers set up a system to avoid learning of the medical conditions of inmates or avoid taking responsibility for inmate health.[42]  Dr. Giftos' subjective belief – which has no basis in the record evidence – that Dr. Braga and PA Schwieger acted in bad faith and purposefully set up a system of care intended to neglect and allow inmates to suffer is not evidence of a fact that the court can consider when deciding a summary judgment motion.  See id. at 71; see Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" or defeat summary judgment).  Expert opinion or testimony "is useful as a guide to interpreting . . . facts, but it is not a substitute for them."  Brooke Grp. Ltd., 509 U.S. at 242.

Thus, while AIMG arguably could have arranged its relationship with the County to allow for more inmate oversight by the AIMG providers or more time spent at the jail by the AIMG providers, those alleged failings "can be characterized, in the best light for the non-

---

[42] See doc. no. 44 at 69.

movant, as negligence; [they do] not rise to the level of a 'deliberate indifference' claim."
Bowen, 966 F.2d at 17; Leavitt, 645 F.3d at 503 (rejecting deliberate indifference claim based on theory that third-party correctional medicine providers "ought to have been more proactive in following up on" the inmate's care).

      Having neither met nor treated Sacco in May 2019 prior to his ultimate demise on May 21, nor been made aware of his medical condition during his detention, the plaintiff has likewise failed to adduce any evidence that the risk of serious harm to Sacco was "obvious" to Dr. Braga or PA Schwieger.  See Farmer, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").[43]  Moreover, no reasonable factfinder could conclude – based on the mere fact that a large number of detainees enter the jail with substance misuse disorder, and are thus susceptible to experiencing withdrawal symptoms while in the jail – that it would be obvious to the providers that Sacco (a detainee whom neither provider had met or directly interacted with) was at risk of serious harm.  Plaintiff therefore cannot show, as a matter of law, that the AIMG providers willfully blinded themselves to the substantial risk of serious harm presented by Sacco's serious medical needs.

      **Supervisory liability**.  Plaintiff alternatively asserts a § 1983 deliberate indifference claim against Dr. Braga and PA Schwieger under a supervisory liability theory.  Supervisory liability under § 1983 generally arises in three ways:  (1) "the supervisor may be a 'primary violator or direct participant in the rights-violating incident,'"; (2) "liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward

---

[43] There is also no record evidence that Dr. Braga or PA Schwieger knew about Sacco's prior detentions at the Valley Street Jail or the medical care he received from the nursing staff during those detentions.  Plaintiff alleges in its objection that Dr. Braga knew that jail nurses placed Sacco on detox watch during a prior detention, but cites no record evidence to support that allegation.

the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation[,]'" Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (quoting Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)); or (3) the supervisor's behavior may be deliberately indifferent "by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581–82 (1st Cir. 1994). Plaintiff presses the latter two forms of supervisory liability. "Under this rubric, a supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights." Id. (emphasis added).

Plaintiff must also "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." Id. "This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient casual nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Id. "A causal link may also be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations. When the supervisor is on notice and fails to take corrective action, say, by better training or closer oversight, liability may attach." Id.; see also Penate v. Hanchett, 944 F.3d 358, 367 (1st Cir. 2019) (noting the "long-established principle" that "[n]otice is a salient consideration in determining the existence of supervisory liability") (emphasis and alteration in original). "[I]solated instances of unconstitutional activity," however, "ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." Maldonado-Denis, 23 F.3d at 582.

Plaintiff's supervisory liability claim fails as a matter of law for at least two reasons. Before addressing those reasons, the court notes its skepticism that a rational factfinder could conclude from this record that the AIMG providers held a "supervisory" position over the jail nurses, as that term is understood in the context of constitutionally inadequate medical care claims.  It is undisputed that the AIMG providers do not have the authority to hire, discipline, or terminate the County nurses or medical staff.  The nurses are employees of the County, not AIMG.  The services agreement between AIMG and the County does not expressly include a duty of supervision and instead states that "[e]ach party will be solely responsible for the conduct of their own employees, officials, officers, directors, contractors, agents, and/or representatives." A responsibility to "consult and collaborate" with the nursing staff in providing medical care to the inmates does not impliedly create a supervisory relationship that could give rise to supervisory liability in this context.

Likewise, the plaintiff has cited no case law where a court concluded, or even assumed, that a third-party, contracted medical provider like Dr. Braga or PA Schwieger held a supervisory position over prison employees.  The main case it relies on – Miranda v. Munoz – involved a supervisory liability claim against employees of the Puerto Rican correctional system who were "responsible for the administration of the entire prison system," not outside independent medical contractors like Dr. Braga and PA Schwieger.  Miranda v. Munoz, 770 F.2d 255, 260 (1st Cir. 1985).

There is, however, some conflicting evidence as to the level of control and power that Dr. Braga and PA Schwieger held over the nurses.  And "supervisor" in this context has been "defined loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior."  Camilo-Robles v. Hoyos, 151 F.3d 1, 6–7 (1st Cir.

1998).  The court will therefore assume, without deciding, that the requisite supervisory relationship existed.

Even after making such assumptions, the record evidence does not establish that Dr. Braga or PA Schwieger supervised or trained the nurses with willful blindness or "deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'"  Sanchez, 590 F.3d at 49.  While the plaintiff is correct that neither Dr. Braga nor PA Schwieger have conducted formal training sessions with the nurses, they speak to the nurses and "provide education on a continual basis," whether through responding to questions about specific inmates or providing general feedback.[44]  Based on their experience at Valley Street, it appears that the AIMG providers believed that the nurses were adequately trained on how to assess the severity of withdrawal symptoms (both through their formal nursing education and on-the-job training at the jail) and understood how to initiate and execute the withdrawal protocols and standing orders.[45]  That AIMG entrusted the nurses with those responsibilities does not equate to deliberate indifference.

Even if the plaintiff presented evidence that Dr. Braga or PA Schwieger knew that the nurses were inadequately trained, the First Circuit Court of Appeals has found in the supervisory liability context that "knowledge of earlier inadequate training . . . is a mile away from showing willful blindness or deliberate indifference to a supposed continued failure of training."  Alsina-Ortiz, 400 F.3d at 82.  Instead, establishing supervisory liability for deliberate indifference

---

[44] Braga Depo. (doc. no. 44-20) at 29, 108-09; see also id. at 42 ("[O]n a day-to-day [basis], if a nurse feels she wants to call and is telling me that someone has active signs of withdrawal and maybe they're on the fence about starting the protocol, often times I'll say, yeah, I think it's appropriate to start the protocol, and then they'll go ahead and initiate medication."); Schwieger Depo. (doc. no. 44-17) at 19.

[45] Braga Depo. (doc. no. 44-20) at 26.

requires evidence that the nurses' "training regime . . . had failed on a large scale" and that if it

had failed on a large scale, the AIMG providers "knew that it had or was willfully blind or

indifferent to that failure." Id. The record here contains no such evidence. Plaintiff has failed to

proffer evidence of a history of widespread civil rights deprivations or constitutionally

inadequate medical care that would have put AIMG on notice that the nurses were improperly

trained or educated, or unqualified to provide withdrawal care to inmates at Valley Street.

There is likewise no evidence that Dr. Braga or PA Schwieger formulated policies or

engaged in customs that led the County nurses to provide deliberately indifferent medical care to

Sacco.[46] See Maldonado-Denis, 23 F.3d at 581-82. The AIMG providers reviewed the detox

procedures and standing orders for withdrawal protocols and deemed them adequate. During the

term of their initial contract with the County, the providers saw no need to revise these policies.

In fact, Dr. Braga testified that the withdrawal assessment practices that the nurses used at the

time of Sacco's detention were on par with the COWS scale and even used objective markers

like orthostatic vital signs that, in his experience, are not typically included in a COWS scale

---

[46] Plaintiff does not address the fact that in order to prove supervisory liability, it must also prove that the subordinate's behavior "[was] itself violative of a plaintiff's constitutional rights." Maldonado-Denis, 23 F.3d at 582; see also Aponte Matos v. Toledo-Davila, 135 F.3d 182, 192 (1st Cir. 1998) ("Supervisory liability for constitutional injuries attaches only when:  (1) there is subordinate liability") (quotations omitted). It is hardly clear from the summary judgment record that any of the three remaining nurse defendants provided constitutionally inadequate medical care to Sacco. Plaintiff's experts opined that these nurses could have provided additional or different withdrawal care to Sacco that would have prevented his untimely death, but those arguments resemble a disagreement with the course of treatment that cannot support a deliberate indifference claim.  See Miranda, 770 F.2d at 259 ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law[.]" (citations and internal quotation marks omitted)). Because the court finds the plaintiff's supervisory liability claim deficient for other reasons, it need not decide whether the plaintiff can satisfy this element of its claim.

evaluation.[47]  While the plaintiff's experts disagree as to the effectiveness of these policies or

practices, mere disagreement as to the sufficiency of a policy or training measure is insufficient

to support a deliberate indifference claim.  See DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir.

1991) ("[A] claim of inadequate medical treatment which reflects no more than a disagreement

with prison officials about what constitutes appropriate medical care does not state a cognizable

claim under the Eighth Amendment."); Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980)

(holding that "disagreement on the appropriate course of treatment . . . may present a colorable

claim of negligence[ ] but . . . falls short of alleging a constitutional violation").

    Moreover, as noted above, the plaintiff has introduced no evidence suggesting that the

withdrawal care regime at Valley Street had failed other inmates on a large scale, such that

AIMG was on notice that the withdrawal protocols it approved would eventually lead to a

deprivation of Sacco's civil rights.  See Mahan v. Plymouth Cty. House of Corr., 64 F.3d 14, 18

(1st Cir. 1995) (ruling that prison official "cannot be held liable for failing to adjust its policy to

accommodate a 'serious medical need' of which it was not made aware").  At the time of Sacco's

unfortunate death, his case appears to be an aberration at Valley Street.  Moreover, death

resulting from opiate withdrawal (as alleged here) also appears to be rare.  Without any prior

examples in the record of the alleged dangers posed by AIMG's withdrawal protocols, no

rational factfinder could conclude that the AIMG providers were deliberately indifferent by

continuing to use those policies.  See Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 768

(1st Cir. 2010) ("An important factor in making the determination of liability is whether the

official was put on some kind of notice of the alleged violations, for one cannot make a

---

[47] Id. at 25.

'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps.").

Next, any causal connection between Dr. Braga's or PA Schwieger's alleged supervisory failures and the nurses' allegedly inadequate medical care is too speculative to support a constitutional claim.  Plaintiff devotes less than a page in its 74-page brief to this dispositive element of its § 1983 claim, arguing only that it "can show" the necessary causal link.[48]  Indeed, the Estate simply concludes that where it "has established that the AIMG defendants had the power and duty to alleviate the conduct at issue, it must also be found that they encouraged, condoned, or acquiesced to it."[49]  Such a conclusion is factually incorrect, legally unsupportable, and insufficient to stave off a properly supported summary judgment motion.  There are genuine factual disputes about whether the AIMG providers had the power and duty to alleviate the alleged unconstitutional conduct at issue.  More importantly, whether a provider had the power and duty to alleviate the nurses' conduct does not, by logical extension, mean that they "encouraged, condoned, or acquiesced to it," particularly when the plaintiff cites to no evidence of such encouragement, condonement, or acquiescence.

Plaintiff then speculates, without evidentiary support, that the AIMG providers "knew that, as a result of their failures, they were not having even indirect care with inmates experiencing withdrawal symptoms, and that HCDOC inmates were being left to suffer without access to medical care."[50]  There is no evidence in the record that Dr. Braga and PA Schwieger knew that Valley Street inmates experiencing opioid withdrawal symptoms were being left to

---

[48] Doc. no. 44 at 71.

[49] Id.

[50] Id.

suffer without medical care (itself a dubious and factually unsupported claim).  Instead, based on

the record before it, the court finds that at best (or worst) – in other words, reading it in the light

most favorable to the plaintiff – Sacco's case is an isolated instance of alleged unconstitutional

activity, which is "insufficient to establish a supervisor's policy or custom, or otherwise to show

deliberate indifference."  Maldonado-Denis, 23 F.3d at 582.

Plaintiff contends that Valley Street inmate medical records from the year prior to

Sacco's detention show that the nurses and AIMG provided the same allegedly inadequate care

to other withdrawing inmates and that this shows that the conditions at the jail were "routinely

poor."  But beyond baldly concluding that the AIMG providers knew that Valley Street "inmates

were being left to suffer without access to medical care" – a statement without any evidentiary

support – the plaintiff has failed to offer any evidence of "a known history of widespread abuse

sufficient to alert a supervisor to ongoing violations."  Id.  In other words, perhaps it is true that

other inmates received similar withdrawal care as Sacco, but at least based on the summary

judgment evidence the plaintiff has presented to the court, none of those inmates perished,

required hospitalization, or saw their condition worsen as a result of the care.[51]  As far as the

court can discern, those inmates endured the withdrawal process without major issue.

Such "tenuous assertions strung together by strands of speculation and surmise" are

insufficient to "survive summary judgment."  Maldonado-Denis, 23 F.3d at 583.  "Supervisory

liability attaches only if a plaintiff can demonstrate by material of evidentiary quality an

affirmative link between the supervisor's conduct and the underlying section 1983 violation."

Id.  And here, the "record is bereft of any proof, direct or inferential," of a causal link between

the AIMG providers' alleged supervisory failures and the alleged deprivation of constitutional

---

[51] See "Fed. R. Evid. 1006 Summary" (doc. no. 44-28).

27

rights.  Id.  "Perhaps [the AIMG providers were] not as aware as one would like a medical professional to be, but 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment," required to support a deliberate indifference claim.  Leavitt, 645 F.3d at 503 (quoting Farmer, 511 U.S. at 838).  Dr. Braga and PA Schwieger's motion for summary judgment on the plaintiff's § 1983 is accordingly granted.

### B.      Qualified Immunity

The AIMG Defendants also argue that qualified immunity bars the plaintiff's § 1983 claim.  A defendant is not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)); see also Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (describing the second element as "whether the right was 'clearly established' at the time of the defendant's alleged violation").  The AIMG Defendants argue that even if the court finds that they violated Sacco's constitutional rights, the unlawfulness of their conduct was not clearly established at the time of the violation.[52]  Plaintiff does not dispute that a non-governmental party such as the AIMG Defendants may be entitled to assert a qualified immunity defense. Instead, it argues that the defense does not apply because the providers violated Sacco's clearly established constitutional right to medical care that is not deliberately indifferent to his serious medical needs.  See Cady v. Cumberland Cty. Jail, No. 2:10-CV-00512-NT, 2013 WL 3967486, at *33 (D. Me. Aug. 1, 2013) (observing that "it has long been clearly established that deliberate indifference to a prisoner's serious medical needs or to a substantial risk of serious harm

---

[52] See doc. no. 56-1 at 2.

amounts to a constitutional violation" and finding that "a reasonable person in the shoes of the individual [third party medical provider] defendants would have understood that his or her conduct violated [the inmate's] constitutional rights").

Because the court finds, as a matter of law, that the AIMG providers did not violate Sacco's constitutional rights, it need not determine whether those rights were "clearly established" at the time of his detention.  The AIMG Defendants' motion for partial summary judgment on qualified immunity grounds is therefore denied as moot.

### C.     Medical negligence

Turning to the plaintiff's medical negligence claim, the defendants contend that they are entitled to summary judgment for two reasons.  First, they argue that if the court dismisses the plaintiff's § 1983 claim, it should decline to exercise supplemental jurisdiction over the state law negligence claim.  The AIMG Defendants also submitted a supplemental brief on jurisdiction after the summary judgment hearing.[53]  Second, they argue that the plaintiff's negligence claim fails as a matter of law for a lack of duty.  The court addresses and rejects each argument for the reasons that follow.

### 1.     Supplemental jurisdiction

The court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental

---

[53] See doc. no. 93.  While the court neither asked for supplemental briefing on this issue nor deemed it necessary, defense counsel expressed a desire near the end of oral argument, after the court explained that it would likely deny summary judgment on the negligence claim, to brief the issue.  The court did not close briefing or discourage the filing.

state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)

(emphasis added); see also Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f

the federal claims are dismissed before trial, . . . the state [law] claims should be dismissed as

well."). Ordinarily in those circumstances, "the balance of factors to be considered under the

pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point

toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon

Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Here, unlike in the ordinary case, the balance of

factors tips in favor of continuing to exercise supplemental jurisdiction over the plaintiff's

negligence claim.

First, the plaintiff's negligence claim qualifies for supplemental jurisdiction under

§ 1367(a), as it derives from the same "common nucleus of operative fact[s]" as the § 1983

claim. Gibbs, 383 U.S. at 725. The AIMG Defendants contend that because there was an

alleged "temporal break" in the facts giving rise to the negligence claim and the facts giving rise

to the § 1983 claim, the two claims do not arise from a common nucleus of operative facts. The

court is not persuaded. Plaintiff's claims against all defendants center on Sacco's brief detention

at the jail, the withdrawal symptoms he experienced, and the adequacy of the medical care he

received. While this case, like many cases involving multiple claims and multiple defendants,

also involves some ancillary issues, those issues will not predominate over the core issues at trial

and do not necessitate severing the state claim. Cf. Serrano-Moran v. Grau-Gaztambide, 195

F.3d 68, 69 (1st Cir. 1999) (affirming decision not to exercise supplemental jurisdiction over

negligence claim where the "facts and witnesses" supporting the claims are different and the

federal civil rights claim had nothing to do with medical care).

Next, since the case began in 2020, the parties have completed fact discovery, disclosed experts, and completed expert discovery to develop a robust record in this court. The negligence claim is ready for the soon-approaching trial and plaintiff's counsel wishes to try its case in this court. To require the plaintiff to re-file its negligence claim against one group of defendants in state court and start over would be inconvenient, unfair, and not an economic use of judicial resources. The AIMG Defendants argue in their supplemental brief that their early and persistent requests that the negligence claim be dismissed amounts to an unfairness if required to try the case in this court.[54] As a factual matter, that is not entirely accurate. Defendants are correct that they asked the court to decline supplemental jurisdiction in a motion to dismiss and in their original summary judgment motion. It was not until their summary judgment reply memorandum, however, that the defendants argued that the duty question presented a novel issue of state law.[55] That argument – which received two sentences in a footnote in the reply – was undeveloped and importantly did not include the argument defendants only recently raised that the state law claim presents a substantial question of state law that is better addressed by the state courts.

The AIMG Defendants also cite no authority for the proposition that raising the jurisdictional issue early (albeit not in the same manner as presently developed) establishes or even contributes to unfairness. That the AIMG Defendants moved to dismiss early in the case, signaling to the plaintiff that the defendants would seek to litigate the negligence claim in state court, does not lessen – and, frankly, bears no relation to – the inconvenience, unfairness, and prejudice the plaintiff would experience if it had to litigate in state court at this late juncture.

---

[54] Doc. no. 93 at 7-8.

[55] See doc. no. 47.

Finally, the negligence claim does not appear to present a particularly complex issue of law that would favor resolution by a state court.  See Cavallaro v. UMass Memorial Healthcare, Inc., 678 F.3d 1, 9 (1st Cir. 2012) (approving district court's exercise of supplemental jurisdiction when "[t]he claim arises from the same nucleus of facts as the rest of plaintiffs' claims, the question is purely legal and, although perhaps novel, it is by no means complex").

At oral argument and in their supplemental brief,[56] the AIMG Defendants suggested for the first time that the question of the AIMG Defendants' alleged tort duty was a substantial question of state law that was better addressed by state courts and, if decided in the plaintiff's favor, would break new ground in New Hampshire tort law.  They accordingly requested that the court either decline jurisdiction or certify certain questions to the New Hampshire Supreme Court.  The court views the issues differently.  As explained below, while the New Hampshire Supreme Court has not addressed this particular factual scenario, it has determined whether tort duties exist and applied the Restatement (Second) of Torts for over 50 years in numerous other contexts.  See Bloom v. Casella Constr., Inc., 172 N.H. 625, 629 (2019) ("We have referenced Section 324A of the Restatement (Second) of Torts in several cases and conclude that it is consistent with our analysis of whether liability exists in these circumstances") (citing cases dating back to 1970).  The issue is therefore neither truly novel nor complex.

Moreover, the exercise of supplemental jurisdiction is discretionary and the court has other options – besides declining jurisdiction or certifying the question to the state supreme court – available to it under these circumstances.  The "absence of governing precedent in New Hampshire" on the issue of whether the AIMG Defendants have a duty of care here and the scope of that duty "does not necessarily preclude that theory in this case" or require this court to

---

[56] See doc. no. 93 at 1-2.

certify the question to the New Hampshire Supreme Court.  Jenks v. New Hampshire Motor
Speedway, No. 09-CV-205-JD, 2012 WL 1393977, at *1 (D.N.H. Apr. 23, 2012) (DiClerico, J.).
Instead, "[w]here the highest [state] court has not spoken directly on the question at issue, [the
federal court] must predict, as best [it] can, that court's likely answer."  Nolan v. CN8, 656 F.3d
71, 76 (1st Cir. 2011).  The prediction is based on the state supreme court's analogous decisions,
any decisions of lower state courts, and other reliable sources such as the decisions of other
courts and commentary in treatises.  See Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011);
Acosta–Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 54 (1st Cir. 1998).  The court follows
this path in its duty analysis infra.

The defendants' last minute brief on the discretionary exercise of jurisdiction reveals
their primary motive for imploring the court to decline supplemental jurisdiction over the
plaintiff's negligence claim at this late stage in the case.[57]  There, they admit that if this court
declines jurisdiction and the negligence claim proceeds in state court, they will again move for

---

[57] The AIMG Defendants suggest in their supplemental brief that their summary judgment
motion has been ripe since December 2021, so they bear no responsibility for the proximity of
this order to the trial date.  Not so.  Defendants are correct that they filed their summary
judgment motion before the close of discovery and the motion ripened in December 2021.  The
court warned the parties at the outset of the case, however, that "any motions for summary
judgment that are directed at discrete issues and filed well before the close of discovery are
unlikely to receive expeditious treatment."  See Order (doc. no. 19) at 1.  Moreover, while the
AIMG Defendants' summary judgment motion was pending, and after the court had scheduled a
hearing on that motion, the County Defendants filed their own motion for summary judgment.
At a conference, the court asked the parties if they would be willing to have one hearing on all of
the pending summary judgment motions and the parties agreed.  The court then scheduled a
hearing for May 12, 2022.  That hearing was postponed at the parties' request, however, when
the parties (including the AIMG Defendants) notified the court that they were participating in
mediation.  The AIMG Defendants therefore could have insisted that the court decide their
motion earlier in the case, but they declined to do so.  The court has no criticism for that decision
by the AIMG Defendants, but it is noteworthy in the context of their arguments about timing.

summary judgment.[58]  At oral argument, this court previewed to the parties that it is likely to
deny the defendants' summary judgment motion on the negligence claim and find that the AIMG
Defendants owed Sacco a duty of care.  Armed with that information, the AIMG Defendants
seek a summary judgment do-over before a different judge in state court under the guise of
"jurisdictional concerns."  Allowing such machinations would be fundamentally unfair and
prejudicial, not to mention time consuming and costly, to the plaintiff.  That unfairness is much
greater than the alleged unfairness to the AIMG Defendants if the case remains in federal court;
namely, having the duty question decided without the alleged benefit of supporting stakeholders
filing amicus briefs on their behalf.  Although they argue for the benefit of amicus briefing by
supporting stakeholders,[59] nothing prevented those stakeholders from seeking to participate as
amici in this litigation.

In sum, the interests of fairness, "judicial economy[,] and convenience to the parties are
furthered, and comity is not disserved, by the [c]ourt retaining jurisdiction over the negligence
claim."  Zingg v. Groblewski, No. 15-CV-10771-ADB, 2017 WL 4364179, at *9 (D. Mass. Sept.
29, 2017) (Burroughs, J.), aff'd, 907 F.3d 630 (1st Cir. 2018).  Indeed, there is precedent for the
court's continued exercise of supplemental jurisdiction here.  In Zingg, the district court
continued to exercise jurisdiction over a pretrial detainee's state-law negligence claim against a
prison's outside medical contractor after granting summary judgment on the § 1983 deliberate

---

[58] See doc. no. 93 at 8 ("Discovery is complete, and trial can be set, if necessary, shortly after
resolution of the dispositive motion on whether a duty exists.  Moreover, if the state court finds
that a duty exists . . . .") (emphasis added); 9 ("While there would be a short delay of trial (if the
case survived summary judgment in state court)").

[59] Notably, the list of stakeholders cited by the defendants includes only institutions representing
the interests of healthcare businesses and providers, and no advocates for detainees or inmates
entitled to medical care while incarcerated.

indifference claim.  Id.  The AIMG Defendants' motion for summary judgment on this basis is denied.

### 2.    Duty

Plaintiff's operative complaint asserts a claim for medical negligence against the "individual defendants, as health professionals," contending that they owed Sacco a duty "to provide him with reasonable and proper medical care in accordance with the applicable standard of care" and breached their duties "for the aforementioned reasons, including by failing to adequately monitor, assess, and treat his withdrawal-related symptoms."[60]  Thus, as originally plead, the plaintiff's negligence claim focuses on the specific medical care that Dr. Braga or PA Schwieger provided, or should have provided, to Sacco during his detention.  In response to the AIMG Defendants' summary judgment motion, the plaintiff expands the scope of these alleged duties to include duties to train and supervise the County nurses.  The defendant does not object to this apparent attempt to broaden the scope of the claim, so the court addresses all theories asserted by the plaintiff.  At oral argument, plaintiff's counsel also confirmed that it was asserting a negligence claim against AIMG the entity.

The AIMG Defendants seek summary judgment on this claim based on a lack of duty. Specifically, they contend that because Sacco was not a patient of Dr. Braga or PA Schwieger, neither provider had a duty of care over his medical treatment.  They further argue that the AIMG providers did not assume or voluntarily undertake certain duties to Sacco by virtue of their contractual agreement with the County.  The court disagrees and cannot conclude, as a matter of law, that Dr. Braga and PA Schwieger owed no duties of care to Sacco.

---

[60] Doc. no. 21 at ¶¶ 135-36.

Preliminarily, defendants are incorrect that a claim for medical negligence under New Hampshire law requires a traditional provider-patient relationship. Under RSA 507-E, which governs "[a]ction[s] for medical injury," a provider-patient relationship is not required to sustain a claim. An "action for medical injury" includes "any action against a medical care provider, whether based in tort, contract or otherwise, to recover damages on account of medical injury." RSA 507-E:1, I. A "medical injury" or "injury" includes a variety of "adverse, untoward or undesired consequences" arising generally from "professional services rendered by a medical care provider." RSA 507-E:1, III. The injury may result from:

> negligence, error, or omission in the performance of such services; from rendition of such services without informed consent or in breach of warranty or in violation of contract; from failure to diagnose; from premature abandonment of a patient or of a course of treatment; from failure properly to maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services.

Id. The plain language of these statutes "does not require that an 'action for medical injury' be brought by a patient or that the 'medical injury' at issue be suffered by a patient." In re George, 160 N.H. 699, 702 (2010). And the plaintiff's allegations against the AIMG Defendants "fit comfortably within [the statutory] definition[s]." Id. at 703. Therefore, the alleged lack of a patient-provider relationship between Sacco and the AIMG providers does not doom the plaintiff's negligence claim. See Lord v. Lovett, 146 N.H. 232, 237 (2001) (noting that the definition of "medical injury" is broad enough "to cover all conceivable lawsuits against medical care providers").

Even if the court considered the existence of a patient-provider relationship dispositive on the question of duty, there are genuine disputes of fact as to whether the AIMG providers formed a patient-provider relationship with Sacco during his detention at Valley Street Jail. For example, when he entered the jail, Sacco signed a consent form in which he authorized County

"subcontractors, independent contractors and/or agents to perform any diagnostic laboratory procedures, examinations, x-rays, administer medications, and perform any other medical procedures recommended by the Physician, Dentist, and/or Physician Assistant."[61]  Moreover, Dr. Braga prescribed an inhaler for Sacco and PA Schwieger performed life-saving measures on Sacco before Sacco was transferred to the hospital.  A rational factfinder could conclude that Sacco formed a patient-provider relationship with one or both of the AIMG providers based on these factors.

The court thus turns to whether Dr. Braga, PA Schwieger, or AIMG owed Sacco a duty of care under the circumstances presented by this case.  To recover for negligence under New Hampshire law, "a plaintiff must show that the defendant owes a duty to the plaintiff and that the defendant's breach of that duty caused the plaintiff's injuries."  Christen v. Fiesta Shows, Inc., 170 N.H. 372, 375 (2017).  "Absent a duty, there is no negligence."  Id. (citing Walls v. Oxford Management Co., 137 N.H. 653, 656 (1993)).  "Whether a duty exists in a particular case is a question of law."  Bloom, 172 N.H. at 627.

When determining whether a duty exists in a particular case, New Hampshire courts "encounter the broader, more fundamental question of 'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct."  Walls, 137 N.H. at 657 (quoting Libbey v. Hampton Water Works Co., 118 N.H. 500, 502 (1978)). "The decision to impose liability ultimately rests on 'a judicial determination that the social importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability.'"  Walls, 137 N.H. at 657.

---

[61] See doc. no. 44-19.

New Hampshire courts employ the framework of the Restatement (Second) of Torts to determine whether a duty exists as a result of a negligent undertaking. See Bloom, 172 N.H. at 629; Walls, 137 N.H. at 656 (citing §§ 323, 324 of the Restatement (Second) of Torts). "A party who does not otherwise have a duty, but who voluntarily renders services for another, has been held to a duty of reasonable care in acting." Walls, 137 N.H. at 656. According to the New Hampshire Supreme Court, this duty is derived from § 323 of the Restatement, which provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965). § 324A of the Restatement similarly provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

Through its services agreement, AIMG undertook to render services – for monetary consideration – to both the County and the inmates at Valley Street. A reasonable medical provider in AIMG's position would recognize that those services were "necessary for the protection of a third person," namely, jail inmates. Thus, the AIMG providers owe the inmates a duty of care and are subject to tort liability "for physical harm resulting from [their] failure to

exercise reasonable care to protect [their] undertaking, if [their] failure to exercise reasonable

care increases the risk of such harm, or . . . [they have] undertaken to perform a duty owed by the

other to the third person."  Restatement (Second) of Torts § 324A.  By agreeing to "deliver and

maintain reasonable and medically necessary medical care the inmates" at Valley Street (among

other responsibilities) – a duty itself owed by the County to inmates in its custody – the AIMG

providers owe a duty of care to Sacco under the plain language of § 324A of the Restatement,

which New Hampshire courts have regularly applied.[62]

 While not binding on this court, courts in other jurisdictions have found a duty of care

under §§ 323 and 324A of the Restatement in similar circumstances, including situations where

medical providers did not form traditional patient-provider relationships with the plaintiffs.  See,

e.g., Collip v. Ratts ex rel. Ratts, 49 N.E.3d 607, 615 (Ind. Ct. App. 2015) ("Consequently, we

hold as a matter of law that a physician who enters into a [collaborative practice agreement] with

a nurse practitioner has a duty of reasonable care to the nurse practitioner's patients in fulfilling

his or her obligations under the CPA."); Stanley v. McCarver, 208 Ariz. 219, 223, 92 P.3d 849,

853 (2004) (physician's paid agreement to interpret plaintiff's medical record as part of a pre-

employment screening gave rise to a tort duty because the physician "undertook a professional

---

[62] AIMG's concerns about expanding the scope of tort liability by imposing a duty here are
overstated.  The court concludes here only that the AIMG providers owed Sacco a limited duty
of care under the specific facts and circumstances presented by this case.  This duty arises in the
unique setting of correctional medical care under the backdrop of a medical services agreement
that imposes broad duties on the AIMG providers.  Dr. Braga and PA Schwieger were not merely
working independently at the jail like an independent physicians' group with permission to use a
hospital's facilities.  Cf. Dent v. Exeter Hosp., 155 N.H. 787 (2007) (hospital not vicariously
liable for negligence of independent practitioners who were granted privileges to use hospital
facilities).  They instead agreed to work, and did work, in close consultation with the nurses to
provide medical care to the same patient population.  While New Hampshire courts have not
found a surgeon "responsible for the actions of other professionals neither employed nor
controlled by him," here there is at minimum a genuine dispute as to the level of control that the
AIMG providers exercised over the jail nurses.  Anglin v. Kleeman, 140 N.H. 257, 262 (1995).

obligation with respect to [the plaintiff's physical well being"); Ritchie v. Krasner, 221 Ariz. 288, 297, 211 P.3d 1272, 1281 (Ct. App. 2009) (imposing duty to patient on physician providing an IME); Diggs v. Arizona Cardiologists, Ltd., 198 Ariz. 198, 199, 8 P.3d 386, 387 (Ct. App. 2000) (imposing duty on consulting physician).

Defendants argue that the court cannot impose a tort duty on the AIMG providers because the parties chose not to name jail inmates as third-party beneficiaries under the services agreement. This argument misses the mark. Third party beneficiary status would be dispositive if the plaintiff was asserting a breach of contract claim against AIMG. That the agreement does not explicitly provide contractual beneficiary status on inmates does not, by extension, mean that the existence of the agreement and the broad duties AIMG assumed thereunder cannot impose a tort duty on Dr. Braga and PA Schwieger. As just noted, the agreement plainly serves as the basis for the voluntary undertaking that confers a tort duty upon Dr. Braga and PA Schwieger in this case.

Defense counsel's attempt at oral argument to analogize this case to Grady v. Jones Lang LaSalle Construction Company, Inc. is similarly unavailing. 171 N.H. 203 (2018). There, the plaintiff, an employee of a subcontractor on a construction project, sued the general contractor for negligence arising out of an injury the plaintiff sustained on the project site. One of the plaintiff's arguments was that the subcontractor's agreement with the general contractor imposed a duty of care on the general contractor to protect the safety of the subcontractor's employees. Id. at 208. In that agreement, however, the subcontractor expressly agreed to assume any health-and-safety-related contractual responsibilities of the general contractor. Id. at 207-08. This case does not present a similar delegation of contractual responsibilities. For example, the County nurses did not agree to assume full responsibility for all of AIMG's contractual and other

professional responsibilities to inmates.  Unlike the agreement between AIMG and the County, nothing in the general contract between the general contractor and the project owner suggested that the parties entered into it to benefit subcontractors as a third party.  Grady is therefore distinguishable on its facts and because it arose in the context of a construction project, as opposed to professional medical services.

Moreover, in situations where there is no privity of contract between the alleged tortfeasor and victim, "the obvious foreseeability of injury to the [victim] demands an exception to the privity rule."  Simpson v. Calivas, 139 N.H. 1, 5-6 (1994); see also Redford v. BLM Companies, LLC, 560 F. Supp. 3d 573, 578 (D.N.H.), reconsideration denied, 561 F. Supp. 3d 180 (D.N.H. 2020) (McCafferty, C.J.) (holding that snow removal contractor owed a duty of care to neighboring property owner under § 324A of the Restatement notwithstanding fact that plaintiff was not a party to the contract, in privity with anyone who was, or an intended third party beneficiary under the contract).  Here, it was or should have been clear to Dr. Braga and PA Schweiger that if they failed to meet the requirements under the services agreement with the County, foreseeable injury to an inmate like Sacco could result.  The court therefore rejects the AIMG Defendants' argument that they owed no duty of care to Sacco.

That leaves the question of the scope of Dr. Braga's and PA Schweiger's duties.  "[O]ne who voluntarily assumes a duty thereafter has a duty to act with reasonable care."  Ford v. New Hampshire Dep't of Transp., 163 N.H. 284, 289 (2012).  The defendant's duty is created by the "relation between the parties which the service makes."  Corson v. Liberty Mut. Ins. Co., 110 N.H. 210, 212 (1970) (internal quotation marks omitted).  The scope of the duty, then, is measured by the extent of the service undertaken by the defendant and "limited by what risks, if any, are reasonably foreseeable."  Walls, 137 N.H. at 656; Blessing v. United States, 447 F.

Supp. 1160, 1189 (E.D. Pa. 1978).  "The test of due care is what reasonable prudence would require under similar circumstances."  Weldy v. Town of Kingston, 128 N.H. 325, 330–31 (1986).

Here, the standard of care and the scope of the providers' duties are defined by statute, the services agreement between AIMG and the County, and what actually transpired at Valley Street on a regular basis.  See Bronson v. Hitchcock Clinic, 140 N.H. 798, 801 (1996) ("In a medical negligence action, the plaintiff's burden of proof is defined by statute.") (citing RSA 507-E:2, I (Supp. 1995)).

Under RSA 507-E:2, I(a), the plaintiff has the "burden of proving by affirmative evidence which must include expert testimony of a competent witness or witnesses" the "standard of reasonable professional practice in the medical care provider's profession or specialty thereof, if any, at the time the medical care in question was rendered."  Plaintiff has met its burden of providing such evidence here through the testimony and opinions of Dr. Giftos and Nurse Leuthy, and thus created a trial worthy issue as to its negligence claim.

Moreover, under the services agreement, the AIMG providers agreed to deliver and maintain reasonable and medically necessary medical care to inmates "in accordance with NCCHC/ACA standards, and the Policies and Procedures of the HCDOC."[63]  These standards impose certain duties on providers in Dr. Braga and PA Schwieger's positions that are consistent with the opinion testimony of Dr. Giftos and Nurse Leuthy.  As just one notable example, the NCCHC standards require opioid withdrawal care to be conducted under the supervision of a physician, not through the use of standing orders as was the case here.[64]  The scope of the AIMG

---

[63] Doc. no. 39-2 at 1.

[64] Giftos Affidavit (doc. no. 44-8) at 4.

providers' duties therefore mirror, at a minimum, their responsibilities under the contract with the County.  See Collip, 49 N.E.3d at 616 ("Here, the scope of a physician's undertaking when entering into a CPA is to comply with the terms of the contract to protect the safety of the nurse practitioner's patients. In other words, it is readily apparent that Dr. Collip's 'specific undertaking' did, in fact, extend to the safety of Barger's patients.").  This finding, however, "does not render [Dr. Braga and PA Schweiger] the guarantor[s] of [the County's] medical practices; instead, it merely requires [them] to fulfill [their] duty of reasonable care in complying with the" services agreement.  Id.

In addition, County administrators and nurses understood that the AIMG providers' responsibilities broadly included oversight of the medical care of the inmates.[65]  Nurse Gustafson described AIMG's role as "the providers that care for the inmates" and "oversee[ing] the care that [the nurses] give at the jail."  Nurse Bancroft described AIMG's role as "medically oversee[ing] the inmates."  To that end, the AIMG providers implemented and signed off on standing orders and detox protocols that the nurses understood they were required to follow and did in fact follow.[66]  These standing orders allowed the nurses to administer medications without physician oversight, among other forms of care.  These were not simply administrative policies.  Rather, the AIMG policies "instruct[ed] the [nurses] on how to care for their [patients]."  Dent, 155 N.H. at 792.  At oral argument, defense counsel asserted that Dr. Braga and PA Schweiger had no control over the nurses, but the record belies this contention.[67]

---

[65] Hartley Depo. (doc. no. 44-13) at 43.

[66] Malo Depo. (doc. no. 44-15) at 22-24.

[67] See, e.g., Hartley Depo. (doc. no. 44-13) at 43:6-14, 129; Malo Depo. (doc. no. 44-15) at 22-23.

The AIMG Defendants do not challenge the admissibility of the plaintiff's proposed expert testimony in their summary judgment papers. They instead offer their own experts' opinion testimony that the scope of Dr. Braga and PA Schwieger's duties were narrower than the plaintiff alleges.[68] But at the risk of stating the obvious, the defendants' experts' opinions do not establish that the defendants are entitled to judgment as a matter of law, much less eliminate all genuine disputes of material fact. Viewing the evidence in the light most favorable to the plaintiff, there is a genuine dispute of material fact "about the scope of [the AIMG providers' undertaking] for purposes of" § 324A of the Restatement. Bloom, 172 N.H. at 631. The AIMG Defendants' motion for summary judgment based on lack of duty is accordingly denied. The questions of whether Dr. Braga or PA Schwieger breached these duties and whether those alleged breaches caused Sacco's injuries and death are for the jury to decide. See Young v. Clogston, 127 N.H. 340, 342 (1985). The court here has no pretense of articulating (or predicting that the New Hampshire Supreme Court would articulate) some new legal duty wherebefore not existing under New Hampshire law. Rather, under these facts and circumstances and on this record – which reveals genuine disputes of material fact – it cannot rule that, as a matter of law, no such duty exists.

Because there are factual disputes about the scope of the AIMG Defendants' duty, the court will define that duty with specificity (after receiving further input from the parties) in its final jury instructions for trial. The court notes, however, that based on the sources discussed above and the fact that Dr. Braga and PA Schwieger were the only physician and physician's

---

[68] See Wells Report (doc. no. 56-3); Wilcox Report (doc. no. 56-2).

assistant responsible for the medical care at Valley Street,[69] the duties at the time of Sacco's detention may have included at least the following:  (1) delivery and maintenance of medical care to inmates, which, as the sole physician responsible for a correctional facility, includes "supervis[ing] clinical care provided to the inmates," see NCCHC Standard J-A-02; (2) implementing proper systems of care and oversight to ensure that nurses with limited scopes of practice such as LPNs (both under the law and based on their training and education) are not put in the potentially compromised position of practicing outside of those scopes; (3) providing more formal oversight and training for the County's medical staff; (4) implementing a quality assurance system and conducting regular quality assurance reviews; (5) ensuring that nurses are properly educated on how/when to consistently administer withdrawal care, follow the protocols, and contact AIMG providers; (6) relying on more than standing orders for withdrawal care; and (7) using a recognized scale or measure for determining the severity of withdrawal symptoms (like COWS).

### D.       Rule 56(d) relief

At the time it filed its objection to the AIMG Defendants' first summary judgment motion, the plaintiff alternatively asked the court to deny the defendants' motion or grant other relief under Fed. R. Civ. P. 56(d).  The plaintiff is no longer pursuing this alternative relief, but the court nevertheless observes that Rule 56(d) relief would be improper here.  "When a party confronted by a motion for summary judgment legitimately needs additional time to marshal the facts necessary to mount an opposition, [Rule 56(d)] provides a useful safety valve."  Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007).  The protections of Rule 56(d) are "not

---

[69] The County did not employ its own physician or physician's assistant to work at Valley Street at the time of Sacco's detention.

available merely for the asking."  Id.  Nor is the rule "designed to give relief to those who sleep

upon their rights."  Id. at 10-11 (citing Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86,

92 (1st Cir. 1996)).  Instead, the plaintiff must:

> act diligently and proffer to the trial court an affidavit or other authoritative
> submission that (i) explains his or her current inability to adduce the facts
> essential to filing an opposition, (ii) provides a plausible basis for believing that
> the sought-after facts can be assembled within a reasonable time, and (iii)
> indicates how those facts would influence the outcome of the pending summary
> judgment motion.

Jones v. Secord, 684 F.3d 1, 6 (1st Cir. 2012).

Rule 56(d) requests are typically raised in a standalone motion or submission that "ask[s]

the court to refrain from acting on the summary judgment request until additional discovery can

be conducted."  C.B. Trucking, Inc. v. Waste Mgmt., Inc., 137 F.3d 41, 44 (1st Cir. 1998).  Thus,

a party "may not attempt to meet a summary judgment challenge head-on but fall back on Rule

56(f)[70] if its first effort is unsuccessful."  Id.  That is precisely what the plaintiff sought to do

here by substantively opposing the AIMG Defendants' summary judgment motion but

simultaneously seeking Rule 56(d) relief.  To the extent the plaintiff maintains its Rule 56(d)

request, the court thus rejects it as improperly raised.

---

[70] Rule 56(d) was formerly Rule 56(f), however, "[t]his change in nomenclature is unimportant"
because "the textual differences between current Rule 56(d) and former Rule 56(f) are purely
stylistic" and "the case law developed under the earlier version remains authoritative."  Jones,
684 F.3d at 5 n.2.

### IV.   **Conclusion**

For the reasons set forth above, the AIMG Defendants' motion for summary judgment[71] is GRANTED in part and DENIED in part, the AIMG Defendants' motion for partial summary judgment[72] is DENIED, and the plaintiff's alternative motion for Rule 56(d) relief[73] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 17, 2022

cc:   Christine M. Craig, Esq.
      Anthony Carr, Esq.
      Donald L. Smith, Esq.
      Jonathan A. Lax, Esq.
      Todd J. Hathaway, Esq.
      Abby Tucker, Esq.
      Elizabeth E. Ewing, Esq.

---

[71] Doc. no. 39.

[72] Doc. no. 56.

[73] Doc. no. 45.

47